Austin J. Fox, a minor, by Matthew T. Fricker, guardian ad litem, Plaintiff-Appellant,

v.

CATHOLIC KNIGHTS INSURANCE SOCIETY, a Wisconsin corporation, Defendant-Respondent.†

Court of Appeals

*No. 01–1469. Submitted on briefs February 6, 2002.—Decided April 9, 2002.*

2002 WI App 117

(Also reported in 649 N.W.2d 307.)

† Petition to review granted 7-29-02.

■■■■■■■■■■

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Matthew T. Fricker* of *Kersten & McKinnon, S.C.,* of Milwaukee.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Michelle M. Stoeck* of *Hills Legal Group, Ltd.,* of Waukesha.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1.   SCHUDSON, J.   Austin J. Fox, by his guardian ad litem, Matthew T. Fricker, (Fox) appeals from the circuit court's amended order granting summary judgment to Catholic Knights Insurance Society (CKIS), denying his motion for summary judgment, and dismissing his complaint on the merits and with prejudice. Fox argues that the circuit court erred in concluding that the CKIS life insurance policy for his father, Patrick Fox, had not taken effect by the time Patrick died in a car accident. Fox contends, therefore, that the court erred in granting summary judgment upholding CKIS's denial of his claim for $150,000 under the policy for which Patrick had applied.

¶ 2.   We conclude that under the unusual circumstances of this case, and by operation of WIS. STAT. § 631.11(3) (1999–2000),[1] Patrick's policy was in effect at the time of his death even if a blood test was a condition precedent to the activation of the policy, even though Patrick died before having that test, and even though a blood test could only have been performed on

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

the blood that had been drawn from Patrick following his fatal accident.[2] Accordingly, we reverse.

## I. BACKGROUND

¶ 3.  The facts relevant to resolution of this appeal are undisputed. According to the complaint and summary judgment submissions, on May 21, 1997, Patrick Fox completed a CKIS "Application For Membership And Life Insurance" for a $150,000 term life insurance policy, naming Austin, then two years old, as the primary beneficiary for benefits payable upon Patrick's death. Also on May 21, 1997, Patrick paid CKIS $31.94 for the first premium.

¶ 4.  The application included a section titled, "Receipt For Payment and Conditional Insurance Agreement," which provided, in relevant part:

A. Coverage Amount.

> The amount of insurance that is in effect by this Agreement for each Proposed Insured is the amount shown in the application . . . .

B. Coverage Limitations.

> . . . .

> 2. No coverage shall be in force if the per-

---

[2] Resolving the appeal on this basis obviates the need to address the interesting arguments the parties present on several of Fox's theories challenging the circuit court's conclusion. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issue need be addressed). We do acknowledge, however, that Fox has argued, among other things, that Patrick's policy was in effect regardless of whether the blood testing was done. In this opinion, we will assume that the policy required blood testing before coverage could commence.

son(s) proposed to be insured is not a risk insurable in accordance with CKIS rules . . . .

. . . .

C. When Coverage Begins *(subject to the Limitations in section B above)*

Coverage under this Agreement begins on the **latest** of the following dates:

—The date of this application

—The date of this Agreement

—The effective date specifically requested in the application

—The date of completion of all examinations and medical studies required by the rules and practices of CKIS.

(Underlining added; bold and italics in original.)

¶ 5. The application also included a section titled, "Agent's Report," containing questions for the insurance agent completing the form with the applicant, and concluding with a subsection stating: "Check medical requirements ordered." There followed four options, allowing the agent to indicate whether "Exam," "Blood," "EKG," and/or "Urine Specimen" was required. On Patrick's application, the agent entered an "x" in only the "Yes" box for "Blood."

¶ 6. Patrick was scheduled to have his blood drawn on May 30, 1997. He cancelled that appointment, however, and rescheduled for the afternoon of June 6, 1997. Tragically, in the early morning hours of June 6, Patrick died as a result of massive head and face trauma suffered in a car accident. Shortly after his death, Washburn County Coroner Karen Baker drew a sample

of his blood, which was forwarded to the Wisconsin State Laboratory of Hygiene.[3]

¶ 7. CKIS refused to pay any death benefit. Fred W. Muenkel, CKIS Vice President for Member Services, wrote Patrick's father, Bernard Fox, explaining, in part:

> Although [Patrick] did have a blood draw scheduled prior to his death, he canceled the blood draw and did not have one done prior to his death. The application process and the need for a blood draw was [sic] fully explained at the time of application and the application includes a signed acknowledgement of such procedures and requirements. Because of the failure to obtain the necessary blood draw, the life insurance policy never took effect.

As a result, CKIS refunded the initial premium payment to Patrick's estate, but denied insurance coverage.

¶ 8. On August 19, 1997, at Patrick's father's request, Attorney Thomas Graham wrote Vice President Muenkel, enclosing a July 29, 1997 letter from the Washburn County District Attorney to Patrick's parents regarding the sample of Patrick's blood drawn following the fatal accident and retained by the Laboratory of Hygiene.[4] Attorney Graham's letter concluded, in relevant part:

---

[3] In a number of the summary judgment submissions to which we will refer, the Wisconsin State Laboratory of Hygiene is referred to as "the State Crime Lab" or variations of those terms.

[4] The July 29, 1997 letter, from Washburn County District Attorney J. Michael Bitney to Donna and Bernard Fox, stated, in part:

> Our office has inquired from the coroner's office regarding any blood sample taken from your son, Pat. Ms. Baker advises that a blood sample was taken, and that it was sent to the State Crime Lab in Madison, WI.

638

On behalf of Bernard Fox and the Estate of Patrick Fox, I would ask that you use that blood sample to determine the insurability of Patrick Fox on May 21, 1997. I would ask that you make arrangements with the Wisconsin State Crime Lab for shipment of that blood sample to whatever testing facility or medical facility you wish to use to determine Mr. Fox's insurability. If you need assistance in doing so, I would be happy to assist you.

¶ 9. On August 26, 1997, Vice President Muenkel responded with a letter declining Attorney Graham's request to contact the state laboratory to obtain the blood sample. In his letter, Mr. Muenkel provided a lengthy explanation for CKIS's conclusion that "no policy was ever in place for [Patrick] Fox before he died." In part, he wrote:

[M]ost importantly, [the agent] states that he gave Mr. Fox a Receipt for Payment and Conditional Insurance Agreement which clearly states that coverage will [not] begin until "the date of completion of all examinations and medical studies required by the rules and practices of CKIS."

The Catholic Knights Rate Book . . . specifies that a blood profile is a routine requirement for all applications for coverage in excess of $99,999. Mr. Fox applied

---

We then contacted the Crime Lab and were informed that blood samples are normally kept for six months. The sample may only be released to medical facilities or testing facilities. The crime lab will package and forward the sample to the facility.

Please let me know where you would like the blood sample sent and to whom it should be directed. I will then contact the crime lab and see if they [sic] will release the same without a Court Order to further an insurance claim on Pat's behalf. If, however, they [sic] refuse I would suggest that you contact a private attorney to handle this for you. This office will cooperate with that attorney.

for $150,00[0] in coverage, and, therefore, a blood profile was a condition of our Conditional Insurance Agreement form, without which a final decision for insurance coverage could not be made. The rate [b]ook explains that the blood profile is to be done by one of our paramedical providers, with a complete analysis done according to our prescribed protocol by Osborne Laboratories.

The agent . . . attests that he fully explained the terms of the Conditional Agreement to Mr. Fox, including the requirement that a blood draw would be needed from Mr. Fox before coverage could become effective . . . .

. . . The purpose of the blood profile is to determine insurability of an applicant. Clearly, a deceased person is not insurable. Therefore, a blood draw from a deceased person cannot be used to determine insurability.

¶ 10. Fox brought an action alleging breach of contract under the application and/or the conditional insurance agreement. Resolving the case on cross-motions for summary judgment, the circuit court stated that it had "struggled with it back and forth" but ultimately concluded that section C, "When Coverage Begins," established that coverage had not begun and that Patrick "died before the policy began."

## II. DISCUSSION

¶ 11. Summary judgment methodology is used to determine whether a legal dispute requires a trial. *U.S. Oil Co. v. Midwest Auto Care Servs., Inc.*, 150 Wis. 2d 80, 86, 440 N.W.2d 825 (Ct. App. 1989). A circuit court must enter summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).

■

¶ 12.    Reviewing an order granting summary judgment, we apply the same methodology employed by the circuit court. *Doe v. Archdiocese of Milwaukee*, 211 Wis. 2d 312, 332, 565 N.W.2d 94 (1997). Accordingly, we will reverse a summary judgment decision only when "the record reveals that one or more genuine issues of material fact are in dispute or the moving party is not entitled to judgment as a matter of law." *Strasser v. Transtech Mobile Fleet Serv., Inc.*, 2000 WI 87, ¶ 30, 236 Wis. 2d 435, 613 N.W.2d 142.

■

¶ 13.    The interpretation of an insurance contract presents a question of law we review *de novo*. *Tower Ins. Co. v. Chang*, 230 Wis. 2d 667, 672, 601 N.W.2d 848 (Ct. App. 1999), *review denied*, 2000 WI 36, 234 Wis. 2d 177, 612 N.W.2d 733. Statutory construction also presents a question of law subject to our *de novo* review. *Gloudeman v. City of St. Francis*, 143 Wis. 2d 780, 784, 422 N.W.2d 864 (Ct. App. 1988). Here, examining the conditional insurance contract and applying Wis. Stat. § 631.11(3), we conclude that CKIS was not entitled to judgment as a matter of law and, indeed, that Fox was.

¶ 14.    At first blush, section C of the Conditional Insurance Agreement, specifying when coverage begins, would seem to preclude coverage because Patrick, by the time of his death, had not reached "completion of all examinations and medical studies required by the rules and practices of CKIS." In this case, however, Wis. Stat. § 631.11(3) trumps what otherwise might be the preclusive effect of that provision.

¶ 15.    Wisconsin Stat. § 631.11(3) provides:

EFFECT OF FAILURE OF CONDITION OR BREACH OF PROMIS-SORY WARRANTY. *No failure of a condition prior to a loss* and no breach of a promissory warranty *constitutes grounds for rescission of, or affects an insurer's obligations under, an insurance policy unless it exists at the time of the loss and either increases the risk at the time of the loss or contributes to the loss.* This subsection does not apply to failure to tender payment of premium.

(Emphasis added.) To avoid the statute's impact, an insurer has the burden to prove that the "failure of a condition prior to a loss" affects its obligations under the policy. *See* Comment to WIS JI—CIVIL 3105 (1994) (On issues relating to WIS. STAT. § 631.11(3), "[t]he burden of proof is upon the insurance company as to all questions and it is the middle burden."). Here, while the "failure of a condition"—completion of the blood test and required medical studies—existed at the time of the loss, it did not "contribute[] to the loss," and CKIS did not prove that it "increase[d] the risk at the time of the loss."[5]

---

[5] CKIS argues that WIS. STAT. § 631.11(3) "does not explicitly state whether or not it was intended to apply to conditions precedent" and "is capable of being construed in different ways with respect to whether the term 'condition' includes conditions precedent" and is therefore ambiguous. CKIS then looks beyond the statutory terms and contends that the statute simply is inapplicable to this case. We disagree. It is undisputed that CKIS and Patrick entered into a conditional insurance contract. It is undisputed that completion of a blood test and related medical studies was a condition potentially affecting the date of coverage. The statutory terms, "[n]o failure of a condition prior to a loss," are unambiguous and clearly applicable. *See Peterson v. Midwest Sec. Ins. Co.*, 2000 WI App 213, ¶ 8, 238 Wis. 2d 677, 617 N.W.2d 876 ("If the statute's language is clear, we look no

¶ 16.   Obviously, the failure to complete the blood test and related medical studies did not contribute to the loss. Patrick was killed in a car accident, unrelated to his failure to complete the test.

¶ 17.   Further, CKIS did not prove that the failure to complete the blood test and related medical studies increased the risk at the time of Patrick's death. Had Patrick's blood been drawn before the accident, CKIS could have arranged for analysis of his blood to determine whether he was, in the words of the conditional agreement, "a risk insurable in accordance with CKIS rules." *Only if* the medical study of Patrick's blood revealed something that rightfully reduced his insurability would "the risk at the time of the loss" have been increased. *See* WIS. STAT. § 631.11(3); *see also* WIS JI—CIVIL 3105 (1994) (providing, in part, that under WIS. STAT. § 631.11(3), "[r]isk is increased whenever the chance of loss is increased by a failure of the condition").

¶ 18.   Indeed, CKIS's summary judgment submissions clarified this very point. According to the affidavit of Emma Santiago, a senior underwriter for CKIS:

> The blood and urine test results are used to determine a number of factors which impact the underwriting decision on a life insurance policy including, but not limited to, tobacco usage, indications of liver disease, diabetes, kidney function and drug usage.
>
> An adverse finding in the blood or urine sample can materially affect the underwriting decision either by increasing the premium rating or by declination to extend coverage.
>
> Without a reliable blood and urine sample from the

further and simply apply the statute to the facts and circumstances before us."), *aff'd*, 2001 WI 131, 248 Wis. 2d 567, 636 N.W.2d 727.

applicant, [CKIS] is unable to complete the underwriting process in accord with its standards and guidelines.

¶ 19.   Thus, analyzing the blood drawn following Patrick's fatal accident could have enabled CKIS to determine whether his insurability would have been affected by any condition, detected through blood testing, that "increase[d] the risk at the time" of his death. *See* Wis. Stat. § 631.11(3). But not performing the analysis precluded CKIS from determining whether a failure to complete "all examinations and medical studies required by the rules and practices of CKIS," under section C of the conditional contract, would have prevented the detection of a condition that would have "increase[d] the risk at the time" of Patrick's death. *See* Wis. Stat. § 631.11(3).

¶ 20.   Nevertheless, CKIS presents two intriguing fact-based theories that, if correct, could counter our analysis. One theory, however, substantially misrepresents the record; the other, while more supportable, still fails.

¶ 21.   First, in its brief to this court, CKIS writes that it "required both a blood and urine sample as a condition to commencement of the coverage subject to a determination of insurability," and that "no urine sample as required for this level of insurance was ever submitted." The documentary record, however, refutes CKIS's contention that Patrick's conditional contract required a urine sample. While the Santiago affidavit states that "[w]ithout a reliable blood *and* urine sample from the applicant, [CKIS] is unable to complete the underwriting process in accord with its standards and guidelines," and while the agent's affidavit stated that he told Patrick that "the terms of the Conditional

Insurance Agreement required that a blood *and* urine specimen be collected and analyzed before coverage could become effective," Patrick's contract required only a blood test. (Emphases added.) As noted, on Patrick's application, the agent did not enter an "x" indicating that "Urine Specimen" was among the "medical requirements ordered."[6]

¶ 22. Second, CKIS argues that Patrick's postmortem blood sample would not satisfy its requirements. CKIS relies on the affidavit of Dr. Charlotte Lee, Senior Vice-President and Medical Director of Osborne Laboratories, an independent testing laboratory that "performed blood and urine analysis tests for [CKIS] life insurance applications," who stated that "the postmortem blood sample collected from Patrick . . . would not have been a useful sample in rendering reliable test results required by [CKIS] for its underwriting requirements." She explained, "Since the blood sample was uncentrifuged, the chemical constituents would have become altered over the period of time between death and the date the specimen was made available for re-testing." Thus, she concluded, the laboratory results

---

[6] CKIS, in its brief to this court, also writes, "[CKIS] requires that life insurance applicants undergo a paramedical exam which includes providing blood *and* urine samples." (Emphasis added.) In support of that assertion, it cites the document containing the "Receipt for Payment and Conditional Insurance Agreement" and the "Notice of Insurance Information Practices." This document, however, while referring to "completion of all examinations and medical studies required by the rules and practices of CKIS," does not specifically refer to blood or urine testing and does not substantiate CKIS's claim in any other way. *See* WIS. STAT. RULE 809.19(1)(e) & (3)(a) (appellate arguments must be supported by authority and record references).

from testing the sample "would not be accurate for insurance testing purposes." We are not persuaded.

¶ 23. Even if, as Dr. Lee opined, Patrick's blood sample was "uncentrifuged" and "would not be accurate for insurance testing purposes," nothing in Patrick's contract conditioned his insurability on any specific timing or methodology for the "medical studies." Notably, while the summary judgment submissions suggested that blood analysis was to be done "according to [CKIS] prescribed protocol by Osborne Laboratories," CKIS concedes that "the Conditional Insurance Agreement does not require that the medical studies be conducted while the applicant is living." And most significantly, any possible inaccuracy in the study of uncentrifuged blood "for insurance testing purposes" punctuates the point: with or without post-mortem blood testing, CKIS simply could not prove that Patrick's failure to provide a blood sample before his death "increase[d] the risk at the time of the loss," under Wis. Stat. § 631.11(3).

¶ 24. Thus, CKIS, by insisting that a urine sample was needed and required, and by claiming that only a "centrifuged" blood sample would have served its purposes, anchors its appellate theories in factual quicksand. We may not assist CKIS by adding conditions to its contract. *See Brown v. Equitable Life Ins. Co. of Iowa*, 60 Wis. 2d 620, 630, 211 N.W.2d 431 (1973) (considering case involving "insurability" as a "condition precedent" to insurance coverage, appellate court does not have "the power to create a new contract for the parties"). And CKIS may not deny coverage based on what, ultimately, emerges as its own failure to even attempt to perform the medical studies its conditional contract required. *See Variance, Inc. v. Losinske*, 71

Wis. 2d 31, 40, 237 N.W.2d 22 (1976) ("[A] party may not take advantage of a failure of a condition when it has unjustifiably prevented that condition from taking place."); *see also Brown,* 60 Wis. 2d at 627 (life insurance applicant's death does not eliminate insurer's obligation to complete good faith investigation to ascertain whether applicant was "insurable as a standard risk" so as to determine insurer's liability under conditional receipt); *Smith v. N. Am. Co. for Life & Health Ins.,* 775 F.2d 777, 778 (7th Cir. 1985) (where life insurance applicant died during time of application processing, insurer "was duty-bound to complete its investigation, and if the investigation had shown that [the applicant] (if he had survived) would have been contractually entitled to the issuance of the insurance policy on which he paid the first premium," insurer would have owed applicant's beneficiaries face value of policy).

¶ 25. Therefore, under the unusual circumstances of this case, the "date of completion" language of section C was not triggered and did not postpone the commencement of coverage. Patrick's coverage began, under the express terms of section C, on "[t]he date of this application" and "[t]he date of this Agreement": May 21, 1997—sixteen days before his death. Accordingly, we conclude that the circuit court erred in granting CKIS's motion for summary judgment; we reverse and remand for the entry of an order granting Fox's motion for summary judgment.[7]

---

[7] Fox also asks this court to conclude that CKIS owes prejudgment interest under Wis. Stat. § 628.46(1). Fox acknowledges, however, that because the circuit court granted summary judgment to CKIS, it did not reach the interest issue. On remand, the circuit court can consider Fox's request.

*By the Court.*—Order reversed and cause remanded with instructions.

¶ 26.  WEDEMEYER, P.J. (*dissenting*).  I write separately from the majority because I believe the trial court correctly ruled that WIS. STAT. § 631.11(3) does not apply to this case, and that because the blood was not drawn from Patrick until after he died, the life insurance policy did not go into effect.

¶ 27.  This is a significant case in the development of insurance law as it is the first Wisconsin case to interpret WIS. STAT. § 631.11(3). I conclude that the majority has incorrectly interpreted the statute. Although the unusual and unfortunate circumstances presented in this case generate sympathy for Patrick and his family, our decision cannot be influenced by those circumstances, but must be decided by the language of the statute and the language of the insurance provisions involved. There is an old saying that "tough cases make bad law," and I fear that is what will happen here if this case is published.

¶ 28.  As noted, our review on a summary judgment decision, the interpretation of a statute, and the interpretation of an insurance contract present issues of law, which this court reviews independently.

¶ 29.  I agree with the trial court that WIS. STAT. § 631.11(3) does not trump the contractual provisions involved because it does not apply under the circumstances presented by this case. This statutory section applies to conditions after the insurance policy comes into effect. Because the insurance policy here never went into effect, § 631.11(3) does not apply.

¶ 30.  My conclusion is supported by four separate sources. First, the statutory language itself suggests that for the requirements under the statute to apply,

there must be an insurance policy in effect. *See* WIS. STAT. § 631.11(3) ("No failure of a condition . . . affects the insurer's obligations under [*an insurance*] *policy* . . . .") (emphasis added). Second, the jury instructions and comment on this statute clearly imply that the statute only applies after a policy is in effect. The instructions use two examples of the "condition" referred to in the statute. The first was the insured's "failure to have a night watchman on the premises" and the second was where the insured stored inflammables on the premises. WIS JI—CIVIL 3105. The comment states that the "condition" the statute refers to is one "that require[s] that something shall or shall not be done *after* the policy takes effect." *Id.* (Emphasis added). The instructions/comment suggest that the "condition" referred to in § 631.11(3) is not a condition precedent, which must occur before the policy takes effect. Rather, the "condition" under the statute is an event that takes place after the contract has come into being.

¶ 31.   My third source is the legislative history behind the statute.[1] The legislative committee comments to WIS. STAT. § 631.11(3) explain:

> This draft seeks a better balance, protecting the insurer against fraud and violations of conditions that would preclude acceptance of the risk, and giving [the insurer] access to the information it needs to under-

---

[1] The majority summarily concludes that the statute is not ambiguous. I disagree. As evidenced by the split of this court in analyzing the statute, reasonable minds differ as to its meaning, and it is therefore ambiguous. *State v. Sweat*, 208 Wis. 2d 409, 416–17, 561 N.W.2d 695 (1997). Because I conclude that the statute is ambiguous, an examination of the legislative history is appropriate. *UVE, Inc. v. LIRC*, 201 Wis. 2d 274, 281–82, 548 N.W.2d 57 (1996).

write, without giving it arbitrary power over the insured through application of the harsh common law doctrines.

¶ 32. Fourth, a Wisconsin federal court faced with this issue concluded that this statute does not apply to the situation where a policy is not yet in effect due to failure of a condition precedent. *LaBonte v. Connecticut Gen. Life Ins. Co.*, 723 F. Supp. 392, 395 (E.D. Wis. 1989) (the "condition" referred to in the statute applies to conditions that occur after the policy takes effect, not before).

¶ 33. This is, in my view, the more reasonable interpretation of the statute and the only interpretation that comports with common sense. It would lead to absurd results to conclude that the statute applies to conditions required before a policy goes into effect. Taking such a premise to its logical conclusion, an applicant could indefinitely postpone required medical examinations and secure life insurance without affording the insurer any opportunity to evaluate the risk or the insurability of the applicant. In fact, the majority points out that the insurance company did not set forth any "specific timing" for the medical studies. Majority at ¶ 23. This was entirely within the potential insured's control. The majority's conclusion will eliminate an insurance company's ability to underwrite the risk that it is to assume in all cases where an insurance applicant postpones or repeatedly delays submitting to required medical studies. There is no reason to infer that WIS. STAT. § 631.11(3) was intended to remove an insurer's ability to perform effective underwriting.

¶ 34. Having concluded that the language of the statute does not apply, the analysis turns to the language at issue in the contract. Here, the conditional agreement provided that coverage would not begin

until "[t]he date of completion of all examinations and medical studies required by the rules and practices of CKIS." Thus, the life insurance contract did not come into being until Patrick completed the required medical studies. "If a condition is attached to the contract's coming into being, there is as yet no contract." *Kocinski v. Home Ins. Co.*, 147 Wis. 2d 728, 738, 433 N.W.2d 654 (Ct. App. 1988) (citation omitted), *aff'd*, 154 Wis. 2d 56, 452 N.W.2d 360 (1990).

¶ 35. Although there is some dispute whether both a urine test and a blood test were required or whether only a blood test was required, that dispute is immaterial because neither test occurred before Patrick died. The trial court made an important distinction when ruling on this matter. It stated that the required medical exam—a blood draw—was not completed until after Patrick died. If Patrick's blood had been drawn before he died, according to the language of the policy, coverage would have gone into effect. Thus, this case was distinguishable from *Brown v. Equitable Life Insurance Co.*, 60 Wis. 2d 620, 211 N.W.2d 431 (1973) because Mr. Brown completed all the medical examinations that were required before he died. *Id.* at 625. Thus, the insurance company in *Brown* had the necessary information to underwrite the risk.

¶ 36. That was not the case here. It is undisputed that Patrick understood he had an obligation to submit to the blood draw and that the coverage would not be effective until that time. Patrick did not complete the blood draw before his death and, therefore, coverage never went into effect. The majority suggests that the insurance company should have attempted to perform the required tests using the blood drawn from Patrick's body post-mortem. Majority at ¶ 19. I disagree. It was Patrick's responsibility to submit to a blood test in the

651

manner prescribed by the insurance company. Moreover, the insurance company submitted an expert affidavit attesting that it would not be able to perform the necessary tests on the post-mortem blood because the chemical components of the blood would have changed and become insufficient for underwriting requirements.

¶ 37. The majority also states that the insurance company "could not prove that Patrick's failure to provide a blood sample before his death 'increase[d] the risk at the time of the loss,' " as required by WIS. STAT. § 631.11(3). Majority at ¶ 23. This statement reveals another reason why § 631.11(3) cannot apply to medical studies required as conditions precedent before an insurance policy becomes effective. If the insured applicant dies before completing the required medical studies, an insurance company will never be able to show that such failure "increased the risk." The purpose of the medical studies is to determine the risk of insuring the applicant. The insurance company does not have the ability to control the timing of the required medical studies, but must rely on the applicant to submit to the testing in a timely fashion. The incentive for the applicant to complete the medical studies timely is that until he or she does so, no coverage is in effect. The majority's opinion changes all that. Now, an applicant does not have that incentive because if he/she postpones the medical tests and dies before submitting to the studies, the insurance company has no way to prove that the applicant would have been denied for medical reasons. The insurance company will have to pay the benefits even though it had no opportunity to underwrite the risks. The legislature could not have intended such a result when it enacted § 631.11(3).

¶ 38.  Accordingly, I respectfully dissent.[2]

---

[2] The conditional agreement also listed "Coverage Limitations." The second limitation stated:  "No coverage shall be in force if the person(s) proposed to be insured is not a risk insurable in accordance with CKIS rules, limits and standards for the plans . . . ." CKIS was never able to determine whether Patrick was a "risk insurable" because he did not complete the medical studies required before he died. Thus, the limitation provides additional support for the conclusion that no coverage was in effect under the conditional agreement or the insurance policy.