Austin J. Fox, a minor, by Matthew T. Fricker, guardian ad litem, Plaintiff-Appellant,

v.

CATHOLIC KNIGHTS INSURANCE SOCIETY, a Wisconsin corporation, Defendant-Respondent-Petitioner.

Supreme Court

*No. 01–1469. Oral argument December 17, 2002.—Decided July 3, 2003.*

2003 WI 87

(Also reported in 665 N.W.2d 181.)

For the defendant-respondent-petitioner there were briefs by *Paul J. Pytlik, Michelle M. Stoeck,* and *Hills Legal Group, Ltd.,* Waukesha, and oral argument by *Paul J. Pytlik.*

For the plaintiff-appellant there was a brief by *George P. Kersten* and *Kersten & McKinnon, S.C.,* Milwaukee, and oral argument by *George P. Kersten.*

An amicus curiae brief was filed by *Anne Berleman Kearney* and *Appellate Consulting Group,* Milwaukee; *Christopher W. Brownell* and *Thrivent Financial for Lutherans,* Appleton; and *Paul F. Heaton* and *The Northwestern Mutual Life Insurance Company,* Milwaukee, on behalf of the Northwestern Mutual Life Insurance Company and Thrivent Financial for Lutherans.

¶ 1. JON P. WILCOX, J. Catholic Knights Insurance Society (CKIS) petitions this court for review of a published opinion of the court of appeals, *Fox v. Catholic Knights Insurance Society,* 2002 WI App 117, 254 Wis. 2d 632, 649 N.W.2d 307. The court of appeals, in a split decision, reversed an order of the Milwaukee County Circuit Court, Timothy G. Dugan, Judge, that granted summary judgment in favor of CKIS. The court of appeals held that coverage existed under an insurance policy even though the policyholder died before completing a required blood test and that under Wis.

211

Stat. § 631.11(3) (1997–98),[1] CKIS is prevented from refusing to pay benefits claimed under the insurance policy.

¶ 2. Austin Fox (Fox), a minor, through his guardian ad litem, brought suit against CKIS, alleging breach of contract after CKIS denied his claim for benefits under the life insurance policy for which his father had applied. Patrick Fox (Patrick), Fox's father, applied for a life insurance policy and listed Fox as the primary beneficiary. Patrick filled out the application and paid the initial premium. The application included a section entitled "Receipt for Payment and Conditional Insurance Agreement." This section noted that coverage under the agreement would not begin until certain conditions were satisfied. One of these was completion of a medical study, a blood test. Unfortunately, Patrick was killed in an automobile accident before completing the blood test. Because the blood test was never done, CKIS denied coverage, claiming that the policy had never gone into effect.

¶ 3. Both parties filed motions for summary judgment in the circuit court. The circuit court ruled in favor of CKIS, finding that no insurance policy was in effect and that Wis. Stat. § 631.11(3) only related to conditions subsequent and, as such, did not apply. Fox appealed, and a divided court of appeals reversed. CKIS then petitioned this court for review, which we granted.

¶ 4. Two related issues arise before this court: (1) whether there was an effective conditional insurance agreement in place at the time of Patrick's death; and (2) whether Wis. Stat. § 631.11(3) applies in this case such that in order to avoid coverage, CKIS

---

[1] All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

must show the failure to complete the blood test increased its risk. We now reverse the court of appeals' decision and hold that the circuit court's granting of summary judgment in favor of CKIS was appropriate. We hold that no effective insurance policy was in place at the time of Patrick's death and that, as a result, Wis. Stat. § 631.11 is inapplicable.

I

¶ 5. The relevant facts of this case are undisputed. On May 21, 1997, Patrick completed an "Application for Membership and Life Insurance" for a $150,000 term life insurance policy from CKIS. In the application, Patrick named Austin Fox, his then two-year-old son, as the primary beneficiary. On that date, Patrick also paid $31.94 as a first premium.

¶ 6. The application contains a section titled "Receipt for Payment and Conditional Insurance Agreement." This section provides, in relevant part:

**Terms and Conditions of Agreement**

A. Coverage Amount.

> The amount of insurance that is in effect by this Agreement for each Proposed Insured is the amount shown in the application, but in no event shall CKIS' liability under this and any other Agreements be more than $300,000 for each Proposed Insured.

B. Coverage Limitations

> . . . .

> 2. No coverage shall be in force if the person(s) proposed to be insured is not a

risk insurable in accordance with CKIS rules, limits and standards for the plans and amounts applied for without any modification as to plan, amount, riders and/or the rate of premium paid.

3. No coverage shall be in effect if there is any material misrepresentation in the application.

. . . .

C. When Coverage Begins (*subject to the Limitations in section B above*)

Coverage under this Agreement begins on the **latest** of the following dates:

—The date of this application

—The date of this Agreement

—The effective date specifically requested in the application

—The date of completion of all examinations and medical studies required by the rules and practices of CKIS.

. . . .

(Bold and italics in original.)

¶ 7. Another section of the application entitled "Agent's Report" required the agent to mark which of several medical requirements applied to the applicant. On Patrick's application, the agent marked only the box for the blood test.[2] In that section, the agent also affirmed that he had explained the Conditional Insur-

---

[2] CKIS asserts that a urine test was also required, despite the fact it was not marked in the Agent's Report. Several affidavits included in the record affirm that Patrick was to complete both blood and urine tests. Because we find the blood

ance Agreement to the applicant. The agent working with Patrick noted in the Agent's Report that he explained the Conditional Agreement. Later, this agent also submitted an affidavit to the circuit court in which he stated that he had fully explained to Patrick the terms and conditions of the Conditional Insurance Agreement and specifically informed him of "the need to complete the required medical studies before the insurance would begin."

¶ 8. Patrick initially set an appointment to get the required medical examination on May 30, 1997. Prior to the appointment, however, he canceled and rescheduled the testing for the afternoon of June 6, 1997.

¶ 9. Unfortunately, early on June 6, 1997, Patrick was killed in a motor vehicle accident. The accident occurred before he completed the required medical testing. However, shortly after his death, the coroner drew a blood sample from Patrick's body and sent it to the Wisconsin State Laboratory of Hygiene for evaluation to determine if alcohol was involved in the accident.

¶ 10. After receiving notice of Patrick's death, CKIS denied coverage and refused to pay any benefits based on Patrick's application. CKIS wrote to Patrick's father and explained that because the blood draw never took place, the life insurance policy never took effect. CKIS refunded the initial premium paid.

¶ 11. On August 19, 1997, at the request of Patrick's family, Attorney Thomas Graham wrote CKIS to request that the insurance company use the post-mortem blood sample to test the insurability of Patrick.

---

test issue alone to be dispositive in the case, this dispute is not material and we do not reach a conclusion about whether a urine test was required.

215

CKIS declined the request on the basis that the blood draw was required before the policy could go into effect and that blood drawn after death was not usable for the purpose of determining insurability. A CKIS Vice President, Fred Muenkel, wrote:

> Based on the language of the life insurance application which Mr. Fox signed, no policy was ever in place for Mr. Fox before he died, and, therefore, Catholic Knights has no coverage obligations. The Application for Membership and Life Insurance which was signed by Mr. Fox and witnessed by Catholic Knights' Agent, Larry Hopke, required Mr. Fox to acknowledge that "the Society reserves the right to require a medical examination and medical studies of any person proposed for coverage." Moreover, Mr. Fox gave his written authorization in the Application for Catholic Knights to obtain medical and non-medical information which "the Society will use . . . to determine eligibility for insurance coverage." Finally, and most importantly, Mr. Hopke states that he gave Mr. Fox a Receipt for Payment and Conditional Insurance Agreement which clearly states that coverage will [not] begin until "the date of completion of all examinations and medical studies required by the rules and practices of CKIS."
>
> The Catholic Knights Rate Book . . . specifies that a blood profile is a routine requirement for all applications for coverage in excess of $99,999. Mr. Fox applied for $150,000 in coverage, and, therefore, a blood profile was a condition of our Conditional Insurance Agreement form, without which a final decision for insurance coverage could not be made. The [R]ate Book explains that the blood profile is to be done by one of our paramedical providers, with a complete analysis done according to our prescribed protocol by Osborne Laboratories.
>
> The agent, Mr. Hopke, attests that he fully explained the terms of the Conditional Agreement to Mr.

Fox, including the requirement that a blood draw would be needed from Mr. Fox before coverage could become effective. . . .

Based on the above, we must decline your request that we contact the state crime lab to obtain a blood sample taken [from] Mr. Fox after his death to determine insurability of Mr. Fox. The purpose of the blood profile is to determine insurability of an applicant. . . . There is no basis in law or under the Insurance Application that would obligate Catholic Knights to have blood drawn and profiled after an applicant's death to determine insurability. . . .

¶ 12. Austin Fox, through a guardian ad litem, then brought an action against CKIS to recover the benefits under the policy. Both parties brought motions for summary judgment in the circuit court. Fox claimed that the policy's condition of the blood test was fulfilled when blood drawn from Patrick after his death was made available to the insurance company. He also argued CKIS could not avoid its obligation because the company could not prove any increased risk from the unfulfilled condition under Wis. Stat. § 631.11(3). CKIS, on the other hand, asserted that there was no policy in effect because Patrick failed to complete the medical exam before his death, and that the blood drawn after Patrick's death was not usable for the purpose of determining insurability.

¶ 13. The circuit court ordered summary judgment in favor of CKIS, finding that Patrick died before coverage began. The court also found that the blood draw was a condition precedent to coverage and that § 631.11(3) related only to conditions subsequent.

¶ 14. In a divided opinion, the court of appeals reversed the order of the circuit court. The majority held that § 631.11(3) was unambiguous and applied to

conditions precedent. Specifically, the court stated: "In this case, however, Wis. Stat. § 631.11(3) trumps what otherwise might be the preclusive effect of [the requirement of a medical exam in the Conditional Insurance Agreement]." *Fox*, 254 Wis. 2d 632, ¶ 14. The court went on to find that because CKIS could not prove that the failure to complete the blood draw and medical studies contributed to or increased the risk of loss, it was required to provide coverage under the policy. The majority found unpersuasive CKIS's arguments that a urine test was required in addition to the blood test and that the post-mortem blood sample would be insufficient for testing insurability.

¶ 15. Judge Ted Wedemeyer Jr., dissented. He agreed with the circuit court's analysis and found that § 631.11(3) was inapplicable. Further, he held that because no blood was drawn from Patrick until after his death, the life insurance policy did not go into effect.

¶ 16. Upon review, we reverse the holding of the court of appeals. We agree with Judge Wedemeyer's dissenting opinion, finding that under the facts of this case, no effective policy of insurance coverage yet existed and, as such, § 631.11(3) does not apply.

II

¶ 17. This case arose as a review of a grant of summary judgment. "[W]e review a grant of summary judgment by applying the same methodology as the circuit court." *Farm Credit Servs. v. Wysocki*, 2001 WI 51, ¶ 7, 243 Wis. 2d 305, 627 N.W.2d 444. Under Wis. Stat. § 802.08(2), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■■■

¶ 18. Neither party here argues that material issues of fact remain. Determining whether summary judgment was appropriately granted here requires us to interpret both an insurance contract and a statute. The interpretation of an insurance contract is a question of law subject to de novo review. *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.,* 2000 WI 26, ¶ 22, 233 Wis. 2d 314, 607 N.W.2d 276 (citation omitted). "Insurance policies are contracts and are governed by the same rules that govern interpretation of contracts in general." *Id.,* ¶ 23. We interpret contracts with the goal of determining and giving effect to the parties' intentions. *Id.*

■■■

¶ 19. Statutory interpretation also raises a question of law that we review de novo. *Gloudeman v. City of St. Francis,* 143 Wis. 2d 780, 784, 422 N.W.2d 864 (Ct. App. 1988). Statutory construction has the purpose of assisting the court to discern and apply legislative intent. *State v. Martin,* 162 Wis. 2d 883, 893, 470 N.W.2d 900 (1991). If statutory language is unambiguous, we apply the statute using the common and generally accepted meanings of the terms. *DNR v. Wisconsin Power and Light Co.,* 108 Wis. 2d 403, 408, 321 N.W.2d 286 (1982). We may refer to a recognized dictionary to determine the common meaning of terms. *Id.* Although the rules of statutory construction preclude us from using legislative history to uncover ambiguity where otherwise none exists, we are not precluded from looking to legislative history " 'to reinforce and demonstrate that a statute plain on its face, when viewed historically,

is indeed unambiguous.' " *Resp. Use of Rural & Agric. Land v. Pub. Serv. Comm.*, 2000 WI 129, ¶ 41, 239 Wis. 2d 660, 619 N.W.2d 888 (internal citations omitted).

### III

¶ 20. We begin our analysis with the language of the statute. Wisconsin Statute § 631.11(3) provides:

> Effect of Failure of Condition or Breach of Promissory Warranty. No failure of a condition prior to a loss and no breach of a promissory warranty *constitutes grounds for rescission of, or affects an insurer's obligations under, an insurance policy* unless it exists at the time of the loss and either increases the risk at the time of the loss or contributes to the loss. This subsection does not apply to failure to tender payment of premium.

(Emphasis added.) The court of appeals found that, contrary to the assertions by CKIS, the phrase "no failure of a condition prior to a loss" was unambiguous and clearly applied to the policy at issue in this case. *See Fox*, 254 Wis. 2d 632, ¶ 15 n.5. The majority held that the language of the statute operated to "trump[] what otherwise might be the preclusive effect" of the requirement for a medical examination. *See id.*, ¶ 14.

¶ 21. We disagree with this interpretation. The court of appeals' interpretation overlooks several important words in the statute. The statute discusses the failure of a condition in the context of rescission and "an insurer's obligations under[] an insurance policy." Wis. Stat. § 631.11(3). Both of these contexts require an effective policy to be in existence, or they make no sense. For example, a policy that does not yet exist cannot be rescinded.

¶ 22. CKIS asserts that the term "condition" is not clearly defined in the statute. We agree to the extent

that the statute does not reference the terms conditions precedent or conditions subsequent. However, the language of the statute makes the correct interpretation clear. Based on the language of § 631.11(3), we believe that the statute only applies to conditions subsequent, not conditions precedent.

■■■■■

¶ 23. Our interpretation of the statutory language is supported in a variety of ways. First, as we have noted, the statute, by its own terms, applies only when there is an insurance policy in effect.[3] "Rescission" and "obligations under[] an insurance policy" cannot apply unless that is the case. As such, conditions to the making of the contract, "conditions precedent,"[4] cannot

---

[3] We note that Wis. Stat. § 600.03(35) defines the word "policy" as "any document other than a group certificate used to prescribe in writing the terms of an insurance contract, including endorsements and riders and service contracts issued by motor clubs." While this definition may well include temporary insurance agreements such as the one at issue here, it does nothing to resolve the underlying question of whether an *effective* policy exists.

[4] The Restatement of Contracts has avoided the use of the terms "condition precedent" and "condition subsequent," noting that the terminology has historically been a source of some confusion. Restatement (Second) of Contracts, § 224 Reporter's Note. Instead, the Restatement refers to "conditions precedent" only as "conditions." *Id.*

While the Restatement expresses some dissatisfaction with the particular terminology utilized, it recognizes that courts have found that there may be events that must occur before a contract will exist. *Id.*, cmt. c (noting that "[w]hen an event that is not normally part of the process of formation of contract is made an event upon which the performance of the contract is dependent, courts often describe it as a condition that must be performed before the contract comes into existence"). The

be implicated by the statute because the policy has not yet come into existence. As has been noted: "Conditions may be imposed in the application whereby no binding contract of insurance is effected until the conditions have been met." *Couch on Insurance* § 11:6 (3d ed. 1999). One insurance scholar has made the importance of a condition precedent in the context of temporary insurance quite clear:

> The effectiveness of a contract of temporary insurance may be made dependent upon the fulfillment of specifically named conditions, such as payment of the first full premium, approval or acceptance of the application by the insurer, *completion of a medical examination,* insurability, issuance or delivery of the policy, *or any combination of the above.* As with any such contractual qualifications, *the conditions must be met in order for a contract of temporary insurance to exist.*

*Couch on Insurance* § 13.10 (3d ed. 1999) (emphasis added)(footnoted citations omitted).[5]

---

Restatement concludes that what it terms "conditions to the parties' performance" are not substantively different from "what are often called conditions to the existence of the contract." *Id.*

We use the terms "condition precedent" and "condition subsequent" for convenience, but note that however described, conditions may be put upon contracts, such that the existence of the contract depends upon satisfaction of the condition.

[5] *See also* Arnold P. Anderson, *Life Insurance Conditional Receipts and Judicial Intervention,* 63 Marq. L. Rev. 593, 595 (1980) (noting that some courts have recognized a showing that certain conditions were met prior to finding interim insurance coverage existed); Alan I. Widiss, *Life Insurance Applications and Interim Coverage Disputes: Revisiting Controversies About Conditional Binding Receipts,* 75 Iowa L. Rev. 1097, 1098 (1990) (noting that an insurer can agree to have coverage begin

¶ 24. A condition precedent relates to the very attachment of risk, whereas a condition subsequent "pertain[s] to the contract of insurance after the risk has attached and during the existence thereof." *Couch on Insurance* § 81:19 (3d ed. 1999). Because conditions precedent relate to the attachment of risk and precede the existence of the policy, application of the requirements of Wis. Stat. § 631.11(3) would make no sense. It would place an impossible burden on insurers. Insurers cannot show, under § 631.11(3), that the failure of such a condition increased the risk at the time of the loss or contributed to the loss because risk has not yet attached. Therefore, we find that if the conditional insurance agreement in this case was not yet in effect, § 631.11(3) is inapplicable.

¶ 25. Fox counters this statutory language argument by noting that the statute specifically excludes one condition precedent, payment of premiums. He argues that the specific exclusion of one such condition means that all other conditions precedent are necessarily included within the bounds of the statute. We cannot agree. We find that the payment of premiums is different from all other types of conditions in that it recurs. As such, it may not always be a condition precedent. Although payment of an initial premium is certainly a condition preceding an insurance policy, premiums are typically due periodically without a lapse in coverage. For example, Wis. Stat. § 632.44(2) requires that every life insurance policy, except group policies, "contain a provision entitling the policyholder to a grace period of

after a condition is met, such as after application is made or upon completion of a medical exam).

not less than 31 days for the payment of any premium due except the first, during which the death benefit shall continue in force." As such, payment of premiums is an altogether different type of condition and is appropriately addressed separately in the statutes.

¶ 26. The court of appeals has recognized the difference between conditions under a contract and conditions to the making of a contract:

> There is a distinction (often blurred) between a condition *under a contract* (where, though there is a binding contract, performance is delayed until the condition is satisfied) and a condition *to the making of a contract* (where there is no contract until the condition is satisfied).

*Kocinski v. Home Ins. Co.,* 147 Wis. 2d 728, 738, 433 N.W.2d 654 (Ct. App. 1988), aff'd by 154 Wis. 2d 56, 452 N.W.2d 360 (1990). Thus, Wis. Stat. § 631.11(3) may apply differently depending on the specific condition in the context of an insurance policy or conditional insurance agreement. The court of appeals provided a good example: " 'Where the parties to the proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed.' " *Id.* at 739 (quoting *Parkview Gen. Hosp., Inc. v. Eppes,* 447 S.W.2d 487, 490–91 (Tex. Civ. App. 1969)).

¶ 27. Having examined conditions precedent generally, we now look for more specific support of our interpretation of Wis. Stat. § 631.11(3). Wisconsin Civil Jury Instruction 3105 indicates that § 631.11(3) was intended to apply only to conditions after an effective policy is in place. Wis JI-Civil 3105 is entitled "Insurance Contract: Failure of Condition or Breach of

Promissory Warranty," nearly identical to the statute. Further, the Comment to the instruction notes that it was patterned, at least in part, after § 631.11(3). The Comment's explanation is especially helpful to our analysis:

> Failures of condition and breach of promissory warranty are closely related and for most purposes can be treated as synonymous. Promissory warranties are those that *require that something shall or shall not be done after the policy takes effect.* Therefore, the above instruction is framed in terms of failure to have a night watchman on the premises and storage of inflammables so as to give examples of what breach of promissory warranty or condition might give rise to the "increase in risk" and "contribution to the loss" the statute speaks of.

Comment to Wis JI-Civil 3105 (emphasis added). The Comment makes clear that the terms are related to the time *after* the policy takes effect.

¶ 28. The jury instruction comment that promissory warranty and failure of condition have been generally treated as synonymous takes us back to the plain language of the statute. The titles of the subsections of Wis. Stat. § 631.11 (1997–98), separating affirmative and promissory warranties, lend additional support to our finding that § 631.11(3) was intended to deal only with conditions subsequent. Since 1975, when the statute was created, Wis. Stat. § 631.11 has had separate provisions for "breach of affirmative warranty" and "breach of promissory warranty." *See* § 41, ch. 375, Laws of 1975. At first, affirmative warranties were dealt with in Wis. Stat. § 631.11(2). *Id.* Then, in 1995, Wis. Stat. § 631.11 was amended and § 631.11(2) became part of the section for "Effect of Negotiations for Contract," § 631.11(1)(b). 1995 Wis. Act 259, §§ 1, 6. Meanwhile,

promissory warranties have always been dealt with separately, under § 631.11(3). *See* § 41, ch. 375, Laws of 1975; 1995 Wis. Act 259, § 7.

¶ 29. This separation is important. *Black's Law Dictionary* differentiates between promissory and affirmative warranties. *See Black's Law Dictionary* 1583 (7th ed. 1999). An affirmative warranty is defined: "A warranty—express or implied—that facts are as stated at the beginning of the policy period. *An affirmative warranty is usu[ally] a condition precedent to the policy taking effect.*" *Id.* (emphasis added). In contrast, a promissory warranty is defined: "A warranty that facts will *continue* to be as stated throughout the policy period, *such that a failure of the warranty provides the insurer with a defense to a claim under the policy.*—Also termed *continuing warranty.*" *Id.* (some emphasis added). These definitions make clear that affirmative warranties typically refer to conditions precedent, while promissory warranties refer to conditions subsequent, conditions relevant to the period *after* an effective policy exists. Therefore, it appears that the terms of § 631.11(3) only relate to conditions subsequent.

¶ 30. In addition to the plain language of the statute, we find that the legislative history of the statute also supports limitation of the applicability of § 631.11(3). Despite commentary from this court in *Brown v. Equitable Life Insurance Company of Iowa,* 60 Wis. 2d 620, 630, 211 N.W.2d 431 (1973) suggesting distaste for insurance industry tools such as conditional receipts,[6] there is no indication in the drafting history

---

[6] The court stated:

> It is not within the province of this court to determine what coverage, in its good conscience, the life insurance industry should

of § 631.11(3) that the provision, or others in chapter 631 for that matter, were created or revised to eliminate or severely restrict such types of insurance.[7] *See* § 41, ch. 375, Laws of 1975; Drafting Record for ch. 375, Laws of 1975. The creation of § 631.11(3) was part of a broad revision to the insurance laws of the state started by the legislature's organization of an Insurance Laws Revision Committee.[8] The first draft of what became

> be required to offer under a conditional receipt. Nor is this court empowered under secs. 601.41(1) and 206.17, Stats., to regulate and approve policies of life insurance. That function is vested by the legislature in the office of the commissioner of insurance. We do not have the power to create a new contract for the parties. Thus, while we may not approve of such a sales device as a conditional receipt and would like to see interim insurance afforded, we are powerless to so legislate.

*Brown v. Equitable Life Ins. Co. of Iowa,* 60 Wis. 2d 620, 630, 211 N.W.2d 431 (1973).

[7] In 1977, George Hardy, legislative counsel for The Northwestern Mutual Life Insurance Company in Milwaukee, Wisconsin, and member of the Industry Advisory Committee that assisted the Insurance Laws Revision Committee in revamping Wisconsin's insurance laws, commented on *Brown* in a paper presented to The Association of Life Insurance Counsel, stating:

> The decision is sound and well-reasoned; unfortunately, the Court felt impelled to invite the Legislature to consider changing the law as the Court found it, in the following gratuitous remarks . . . .

*See* George A. Hardy, *The Life Insurance Law of Wisconsin: Revision of 1967–1977* 425, 467 (1977)(hereinafter *Life Insurance Law of Wisconsin*). Hardy then went on to cite language from the *Brown* decision. *Id.* Notably, however, this commentary does not indicate that the legislature responded to this court's remarks.

[8] As noted in 1967 Wisconsin Legislative Council Report: "The 1965 legislature created the insurance laws revision committee as an interim study committee of the

chapters 631 and 632 of the Wisconsin Statutes was completed in 1970. *See* V Legislative Council and Council Committees, 1969–71, *Insurance Contracts* (Aug. 1970) (hereinafter First Draft). In this draft, the provisions of what became section 631.11(3) were included in section 631.31(3). *Id.* at 27. The language of that provision has remained much the same since its inception.[9] As such, the language chosen for § 631.11(3) preceded this court's decision in *Brown.*

¶ 31. The note to § 631.11 provides some insight into the purposes of revising these insurance provisions. In one of its early reports, the ILRC noted that it intended to draft comments for the purpose of assisting, among others, the legislature and the courts. *See* Report of the Wisconsin Legislative Council, Volume III, *Insurance Laws Revision Committee,* at 90 (Nov. 1967) (hereinafter 1967 Report). The first draft of the statute

---

legislative council to provide a thorough, careful study and modernization, revision and codification of the insurance laws." Report of the Wisconsin Legislative Council, Volume III, *Insurance Laws Revision Committee,* at 87 (Nov. 1967) (hereinafter 1967 Report).

The efforts of the Insurance Laws Revision Committee (ILRC) were led by Professor Spencer L. Kimball, project director. *See* 1967 Report, at 87; *see also* Hardy, *The Life Insurance Law of Wisconsin,* at 426–27.

[9] Section 631.31(3) of this first draft stated:

No failure of a condition prior to the loss and no breach of a promissory warranty shall affect the insurer's obligations under the policy unless it exists at the time of the loss and either increases the risk at the time of the loss or contributes to the loss. Failure to tender payment of premium is not subject to this section but to s. 631.36.

V Wisconsin Legislative Council and Council Committees, 1969–71, *Insurance Contracts,* at 27 (Aug. 1970).

contains essentially the same comment that now accompanies the text of the statute. *See* First Draft, at 27–28. Thus, these comments provide helpful insight into the drafting process for this statute. For instance, the commentary noted that the new section, Wis. Stat. § 631.11(3), "explicitly brings failures of condition within the statutory provision." However, the comments continue: "Whether this actually changes anything is less certain." § 41, ch. 375, Laws of 1975. Thus, as noted in the comments to Wis JI-Civil 3105, failures of condition and promissory warranties were brought together under the new statute to receive similar treatment.

¶ 32. The note also points out that Wis. Stat. § 631.11 (1975) was intended to replace section 209.06 of the previous statutes and broaden it to expressly bring failures of condition within the statute. *See* § 41, ch. 375, Laws of 1975. The note suggests the reason for the explicit "failure of condition" language is to ensure that courts treat the failures of condition and promissory warranties the same, because a line of cases from other states, particularly Massachussetts, treated them differently and allowed insurers to "evade a warranty statute by couching the provision in conditional language." *Id.*

¶ 33. The ILRC comments also show a concern in policies both for the insurers and the insured:

> This draft seeks a better balance, protecting the insurer against fraud and violations of conditions that would preclude acceptance of the risk, and giving it access to the information it needs to underwrite, without giving it arbitrary power over the insured through application of the harsh common law doctrines.

§ 41, ch. 375, Laws of 1975. This comment suggests that

although protection of potential policyholders was deemed important, so, too, was the ability of insurance companies to get the information they need to underwrite policies. Were we to rule that interim insurance is automatically provided upon payment of a first premium, potential insureds would have no incentive to fulfill requirements such as medical examinations which assist insurers with underwriting.

¶ 34. Finally, we note that one federal court in Wisconsin has already had the opportunity to interpret the language of Wis. Stat. § 631.11(3). In *LaBonte v. Connecticut General Life Insurance Company*, 723 F. Supp. 392, 395–96 (E.D. Wis. 1989), a federal district court in Wisconsin held that § 631.11(3) only applied to conditions after a policy takes effect, not before. In the case, the court was faced with a claim for coverage of a person under a group policy, where the person was not an employee. *Id.* at 393. The court found that membership was a condition precedent and, as such, there was no policy and § 631.11(3) did not apply. *Id.* at 395–96.

¶ 35. Based on all of the above, we find that § 631.11(3) only applies to conditions subsequent to a policy becoming effective. Thus, we proceed to the next issue raised in this case—whether an effective policy existed. Fox asserts that there was a binding contract in place at the time Patrick signed the application and paid the initial premium. He further asserts that the condition of a blood test was satisfied by the blood drawn from Patrick after his death. The court of appeals majority agreed, and found that the policy went into effect on May 21, 1997, the day Patrick submitted his application and paid the initial premium. This court does not agree.

¶ 36. We find that there is a great deal of authority for the proposition that the requirement of a medical examination may be made a condition precedent to coverage. Whether a condition is a condition precedent to coverage depends on the language of the contract itself. If the proposed insured does not then get an examination required for coverage to take effect, there is no contract for insurance. *See Couch on Insurance* § 13.10. In discussing conditions typically regarded as precedent to coverage, one leading scholar of insurance law has noted: "Of course, where the applicant becomes ill or dies prior to completing a precedent condition of medical examination, recovery will be denied." *Couch on Insurance* § 13:11, at 13–32 (internal citations omitted).

¶ 37. This type of condition has been examined by numerous courts. In *Protective Life Insurance Company v. Robinson,* 387 S.E.2d 603, 604–05 (Ga. Ct. App. 1989), for example, the Georgia Court of Appeals held that coverage under a conditional receipt for life insurance never became effective where the policy explicitly required a medical exam and the applicant died before submitting to the exam. Similarly, in *Roscoe v. Bankers Life Insurance Company of Nebraska,* 526 P.2d 1080, 1083–84 (Ariz. Ct. App. 1974), the Arizona Court of Appeals found that where a required medical exam was not taken, the application for insurance was incomplete and no contract for temporary insurance existed. *See also Gladney v. Paul Revere Life Ins. Co.,* 895 F.2d 238 (5th Cir. 1990) (holding that failure to satisfy condition precedent means that policy never became effective); *Wolters v. Prudential Ins. Co. of Am.,* 296 F.2d 140 (8th Cir. 1961) (application incomplete because applicant failed to complete medical examination before death);

*Roy v. Northwestern Nat'l Life Ins. Co.,* 974 F. Supp. 508 (D. Md. 1997); *Corn v. United Am. Life Ins. Co.,* 104 F. Supp. 612, 615–16 (D. Colo. 1952) ("Diligent search has failed to reveal a single authority which recognizes the existence of interim insurance where the alleged insured himself had failed to take steps upon which the agreement of the parties conditioned liability."); *Fabrizio v. Fid. and Guar. Ins. Co.,* 494 P.2d 953 (Utah 1972).

¶ 38. Although this court has not previously decided a case regarding failure to get a medical examination prior to death, this court has decided a case raising a similar question regarding a condition precedent to coverage. In *Brown,* 60 Wis. 2d at 628, this court determined that, under the facts of the case, insurability was a condition precedent to coverage under the conditional receipt at issue. In the case, the deceased had applied for a life insurance policy. *Id.* at 622–23. He had a cancerous skin condition of which the agent was aware. *Id.* As a condition to insurance, the applicant was required to have a medical examination. *Id.* at 623. He did so, but soon after, died of a heart problem that was unforeseen and unrelated to the skin condition. *Id.* at 623–24. The court found that a reasonable insured would understand that the policy was conditioned upon a determination of insurability. *Id.* at 627–29. Since the insurance company determined in good faith that the deceased was uninsurable, this court concluded that there was no interim insurance coverage. *Id.* at 630–31.

¶ 39. In *Smith v. North American Company for Life and Health Insurance,* 775 F.2d 777 (7th Cir. 1985), the Seventh Circuit refused to allow collection on a policy where the applicant misrepresented the state of his health and died before submitting to the medical examination requested by the insurance company. The

circumstances and issue in that case were different than those faced here, however. In *Smith,* 775 F.2d at 778, the court noted that the parties agreed that the contract did not "lapse." In that case, then, an effective policy for coverage was in place. There, the court found that the insurer had a duty to complete its investigation. *Id.* A medical examination was not a condition precedent to coverage in that case. *Id.* at 778–781. Here, though, the conditional insurance agreement makes absolutely clear that coverage is not effective until the required medical examination has taken place.

¶ 40. There can be no doubt about the terms of the agreement between Patrick Fox and the insurance company. The agent testified that he explained the necessity of the blood test and Patrick's actions toward getting the test taken care of indicate that he understood there was no coverage until the test was completed. Section C of the Conditional Insurance Agreement specifically states that coverage under the conditional agreement will be effective on the last of several listed dates. Here, the last relevant date is the date of the medical exam. The agreement unambiguously states that no coverage is in effect until the examination (blood test) is taken. The court of appeals suggests that the post-mortem blood sample should suffice. Even putting aside the insurer's concerns about whether the blood could be adequately tested for insurance purposes, the test taken by the coroner after death is insufficient. Life insurance is to be paid upon the death of the applicant. Fox's claim arises from his father's death. There was no effective policy at the time of Patrick's death, however, because he had not yet submitted to the blood test.

¶ 41. We agree with CKIS that were we to decide that a policy did arise in this case, there would be a

danger of absurd results. In *Brown,* 60 Wis. 2d at 625, this court noted that conditional receipts benefit the applicant as well as the insurer. Here, the burden would have shifted to the insurance company to prove a lack of insurability as soon as Patrick took the medical examination. Were we to decide that unconditional interim insurance arises where an applicant pays a premium with his application but dies before fulfilling conditions precedent to coverage, insurers would either have to charge high rates to cover the risk of providing interim insurance or stop providing it altogether. As we have noted, applicants would have no incentive to actually get the required medical examinations or fulfill other required conditions of coverage if even the uninsurable were guaranteed coverage for some period of time before the insurability determination. As noted by the Arizona Court of Appeals, such a determination "would allow one who is not insurable for medical reasons to obtain coverage without knowledge of the company until it discovered the true condition of the insured." *Roscoe,* 526 P.2d at 1083. This court cannot condone such results.

¶ 42. Obviously, the facts of this case are tragic and we sympathize with Patrick Fox's family. Yet the law rules with an even hand and we cannot be controlled by such sympathies. This case implicates basic principles of contract and insurance law. The terms of the "Receipt for Payment and Conditional Insurance Agreement" in this case are clear. We have no doubt that Patrick understood that certain requirements, including the blood test, had to be fulfilled before he would have coverage. However, he died before the requirements were met. As a result, we must conclude that

there was no insurance policy in effect at the time Patrick Fox died and that, therefore, Wis. Stat. § 631.11(3) does ·not apply.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 43. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I write separately to highlight that this is another case in which the court mouths the exclusive plain meaning rule[1] and then properly looks beyond the "plain language" of the statute without finding that the statutory language is ambiguous.[2] Indeed, the majority construes Wis. Stat. § 631.11(3) by

---

[1] Majority op., ¶ 19.

[2] For discussions and criticisms of the plain meaning rule in Wisconsin, *see, e.g., State v. Peters,* 2003 WI 88, 263 Wis. 2d 475, 665 N.W.2d 171 (Abrahamson, C.J., concurring); *State v. Byers,* 2003 WI 86, 263 Wis. 2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring; Crooks, J., dissenting); *State v. Davison,* 2003 WI 89, 263 Wis. 2d 146, 666 N.W.2d 1; *Bruno v. Milwaukee County,* 2003 WI 28, 260 Wis. 2d 633, 600 N.W.2d 656; *State v. Delaney,* 2003 WI 9, ¶¶ 38–40, 259 Wis. 2d 77, 658 N.W.2d 416 (Abrahamson, C.J., dissenting); *State v. Sample,* 215 Wis. 2d 487, 508, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring).

This court has also espoused an alternative rule to plain meaning. *See, e.g., City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 236, 332 N.W.2d 782 (1983) ("[T]he spirit or intention of a statute should govern over the literal or technical meaning of the language used.").

I declared in 1983 that I am a critic of the plain meaning rule and that the court may examine material outside the statute to determine whether persuasive evidence exists of a "clear legislative intention different from that to which an ordinary reading of the plain words of the statute would lead." *Id.* at 243–44 (Abrahamson, J., dissenting). I maintain this position today.

looking to the language of the statute itself,[3] the statute's place in the broader context of insurance law generally,[4] the surrounding language of other statutes,[5] jury instructions,[6] legislative history,[7] and case law.[8] As the majority acknowledges, "Our interpretation of the statutory language is supported in a variety of ways."[9]

¶ 44. I write further, however, to stress that courts, when looking to evidence of legislative intent in the history, context, subject matter, and object of a given statute, must engage in an analysis of both the evidence that supports a given interpretation as well as the evidence that contradicts a given interpretation.[10] Courts must look at all relevant available evidence of legislative intent, with no single factor controlling, and interpret a statute consistently with the preponderance of that evidence.[11] "[A] court should never exclude relevant and probative evidence from consideration."[12]

---

[3] Majority op., ¶¶ 20–24.

[4] *Id.,* ¶ 24.

[5] *Id.,* ¶¶ 25, 28.

[6] *Id.,* ¶¶ 27–28.

[7] *Id.,* ¶¶ 30–33.

[8] *Id.,* ¶ 34.

[9] *Id.,* ¶ 23.

[10] *See, e.g., State v. Davison,* 2003 WI 89, ¶¶ 75–90, 263 Wis. 2d 146, 666 N.W.2d 1 (looking to legislative history and other extraneous evidence that contradicts the plain meaning of a statute to discern legislative intent).

[11] *See, e.g., State v. Stoehr,* 134 Wis. 2d 66, 75–82, 396 N.W.2d 177 (1986) (language, legislative history, purpose, and object of statute all bear on the interpretation of a statute, and legislative intent is determined by considering the direction in which all of these different factors point).

[12] Norman J. Singer, *Statutes and Statutory Construction,* § 45.02 (6th ed. 2000).

¶ 45. In the present case, the majority announces as a rule of statutory construction that courts may examine legislative history when a statute is plain on its face only if that legislative history *supports* the court's "plain" reading of the statute.[13] Specifically, the majority writes, "Although the rules of statutory construction preclude us from using legislative history to uncover ambiguity where otherwise none exists, we are not precluded from looking to legislative history 'to reinforce and demonstrate that a statute plain on its face, when viewed historically, is indeed unambiguous.' "[14]

For my analytical framework for statutory interpretation, *see State v. Byers,* 2003 WI 86, 263 Wis. 2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring); *State v. Peters,* 2003 WI 88, ¶¶ 27–34, 263 Wis. 2d 475, 665 N.W.2d 171 (Abrahamson, C.J., concurring).

[13] As Justice Stevens of the United States Supreme Court notes, "Justice Aharon Barak of the Supreme Court of Israel . . . has perceptively noted that the 'minimalist' judge 'who holds that the purpose of the statute may be learned only from its language' has more discretion than the judge 'who will seek guidance from every reliable source.' A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, may produce a result that is consistent with a court's own views of how things should be, but it may also defeat the very purpose for which a provision was enacted." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 133 (2001) (Stevens, J., dissenting) (citations omitted); *see also* Richard A. Posner, *Statutory Interpretation—In the Classroom and in the Courtroom,* 50 U. Chi. L. Rev. 800, 816–17 (1983) ("By making statutory interpretation seem mechanical rather than creative, the canons conceal . . . the extent to which the judge is making new law in the guise of interpreting a statute or a constitutional provision.").

[14] Majority op., ¶ 19 (quoting *Resp. Use of Rural & Agric. Land v. Pub. Serv. Comm.,* 2000 WI 129, ¶ 41, 239 Wis. 2d 660, 619 N.W.2d 888).

¶ 46. This "rule" is absurd. How does a court know whether legislative history reinforces unambiguous language until it closely examines that legislative history? What is it about legislative history that makes it relevant evidence when it is in accord with a court's interpretation of a statute but irrelevant and inadmissible evidence when it is contrary to the court's interpretation? If legislative history can "reinforce and demonstrate" that a statute, "when viewed historically," is capable of a particular meaning, then there is no rule of law that prohibits a court from considering it when discerning the meaning of that statute.[15] Moreover, a court would be negligent in its duty to discern the intent of the legislature if it refused to consider legislative history that proved to be so probative.[16]

---

[15] *See Train v. Colo. Pub. Interest Research Group, Inc.,* 426 U.S. 1, 10 (1976) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' ") (quoting *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 543–44 (1940)).

Importantly, the Wisconsin "rule" forbidding a court from looking to legislative history except in instances where the legislative history supports an already unambiguous statute, "plain on its face," flatly contradicts the *Train* decision. It is no wonder that the Wisconsin version of the *Train* rule was announced in a footnote without any citation. *See State v. Martin,* 162 Wis. 2d 883, 897 n.5, 470 N.W.2d 900 (1991).

[16] *W. Va. Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 113–15 (1991) (Stevens, J., dissenting) (pointing out many instances in which the Supreme Court has done a "disservice" to the country by putting on "thick grammarian's spectacles" and needlessly ignoring "persuasive evidence of Congress' actual purpose," only to force Congress "to take the time to revisit the matter" and correct the Court's mistake).

¶ 47. The majority opinion does a good job in the present case considering many different factors that bear on legislative intent. Yet the majority does not include in its analysis those factors that run counter to its construction. For example, despite all of the attention given to the statutory phrase "an insurer's obligations under an insurance policy" in Wis. Stat. § 631.11(3) as requiring the existence of a policy before the statute becomes applicable, the majority opinion relegates to a footnote the fact that the legislature has given "policy" a particular statutory definition for purposes of this provision that is very broad and arguably includes the conditional agreement signed by the parties in the present case.[17]

¶ 48. Ultimately, I agree with the majority that Wis. Stat. § 631.11(3) is properly construed to apply only to conditions subsequent, not to conditions precedent. The preponderance of the evidence bearing on legislative intent supports the majority's conclusion. Yet this conclusion can, and should, be reached only after considering all relevant evidence of legislative intent, not merely that evidence which supports the interpretation that the court favors after looking to the statutory language in isolation.

¶ 49. For the foregoing reasons, I concur.

¶ 50. I am authorized to state that Justice WILLIAM A. BABLITCH joins this concurrence.

¶ 51. WILLIAM A. BABLITCH, J. *(concurring).* *"That depends on what the meaning of the word 'is' is."* William Jefferson Clinton.

---

[17] *See* Wis. Stat. § 600.03(35) (1997–98) ("'Policy' means any document other than a group certificate used to prescribe in writing the terms of an insurance contract . . . .").

¶ 52. I write only to emphasize that canons of statutory construction, such as the "plain meaning" rule, are tools, not rules. They are all designed to reach one fundamental goal: discerning legislative intent. Ignoring relevant evidence on legislative intent in the name of "plain meaning" will necessarily at times lead to an interpretation that is completely contrary to what the legislature intended.

¶ 53. Language is inherently ambiguous—perhaps not as ambiguous as the quotation above would have us believe, but the quote makes a point: plain meaning is frequently in the eye of the beholder. What is plain to one may be ambiguous to another. If good evidence as to legislative intent is present, why not use it? Accordingly, I join Chief Justice Abrahamson's concurrence.