In re the Commitment of Harris D. Byers:
State of Wisconsin, Petitioner-Respondent,

v.

Harris D. Byers, Respondent-Appellant-Petitioner.

Supreme Court

*Nos. 99–2441, 00–0454. Oral argument January 21, 2003.—*
*Decided July 3, 2003.*

2003 WI 86

(Also reported in 665 N.W.2d 729.)

For the respondent-appellant-petitioner there were briefs by *Jack E. Schairer and Jefren E. Olsen,* assistant state public defenders, and oral argument by *Jefren E. Olsen.*

For the petitioner-respondent there was a brief and oral argument by *Kevin C. Greene,* Brown County Assistant District Attorney.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Harris Byers, seeks review of a decision of the court of appeals[1] affirming a judgment and order committing him pursuant to Wis. Stat. Chapter 980 (1997–98) to a secure mental health facility as a sexually violent person.[2] Byers asserts that a district attorney lacks authority to file a Chapter 980 petition unless the agency with jurisdiction has first requested the filing of a petition and the Department of Justice (DOJ) has declined. We agree and conclude that a request from the agency with jurisdiction and a subsequent decision by the DOJ not to file are prerequisites to a district attorney's authority to file a Chapter 980 petition. Accordingly, we reverse the court of appeals and remand the matter to the circuit court for dismissal of the petition.

I

¶ 2. Prior to Byers' release on parole in January of 1995, the Department of Corrections (DOC) evaluated Byers to determine his status under the sexually violent person commitment provisions of Chapter 980, Wisconsin Statutes. The doctor who performed the evaluation concluded that Byers did not meet the criteria for referral under Chapter 980. Another evaluation, conducted by a second doctor, took place in August of 1998 after Byers was revoked from parole and shortly before

---

[1] *State v. Byers,* Nos. 99–2441 & 00–0454, unpublished slip op. (Wis. Ct. App. January 23, 2001) (affirming a judgment and orders of the circuit court for Brown County, William C. Griesbach, Judge). The court of appeals' decision also affirmed the circuit court's order denying Byers' post-commitment motion.

[2] All references to the Wisconsin Statutes are to the 1997–1998 version unless otherwise indicated.

his scheduled release date. This evaluation also concluded that Byers was not eligible for commitment. Consequently, the DOC did not request that a Chapter 980 petition be filed against Byers.

¶ 3.  The DOC notified the Brown County district attorney that Byers intended to reside in Brown County after his release. The Brown County district attorney arranged for an independent evaluation of Byers by Dr. Raymond M. Wood. Dr. Wood opined that Byers met the criteria for a Chapter 980 proceeding. Based on this determination and the fact that Byers had been convicted for a "sexually violent offense," the Brown County district attorney concluded that Byers came within Chapter 980's definition of "sexually violent person."[3] The district attorney filed a Chapter 980 petition against Byers prior to his release date and requested a jury trial.

¶ 4.  Byers moved to dismiss the petition claiming that the Brown County district attorney did not have the authority to file the Chapter 980 petition without the DOC requesting that such a petition be filed. He argued that the statutory scheme contemplated that the district attorney would not have authority unless the agency with jurisdiction requested the DOJ to file a petition and the DOJ declined to do so.

---

[3] Wisconsin Stat. § 980.01(7) defines "sexually violent person" as follows:

(7) "Sexually violent person" means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

116

¶ 5. The circuit court concluded that the Brown County district attorney could file the petition even though there was no DOC request and subsequent decision by the DOJ declining to file. It noted that while the authority of the DOJ to file a Chapter 980 petition is conditioned upon a request from the agency with jurisdiction, there is no such condition on the authority of a district attorney.

¶ 6. Byers filed an interlocutory appeal contesting the circuit court's interpretation. The court of appeals denied review.

¶ 7. A jury trial commenced on the issue of whether Byers was a sexually violent person. On the second day of the trial, Byers agreed that he would admit that he was a sexually violent person in exchange for the district attorney's agreement not to oppose his request for conditional release.

¶ 8. At the dispositional hearing, the State did not oppose Byers' request for conditional release, but it also did not join the request. The court determined that institutional care was appropriate and ordered Byers committed to the Wisconsin Resource Center.

¶ 9. Byers appealed the circuit court's judgment and order for commitment. The court of appeals granted Byers' motion requesting remand to the circuit court for a hearing on the effectiveness of his trial counsel. He then filed a post-commitment motion with the circuit court asserting that his trial counsel was ineffective in connection with preserving for appeal the issue of the district attorney's authority. Based on testimony presented, the circuit court found that Byers' trial counsel advised him that this issue would be preserved despite Byers' admission and waiver of rights. The circuit court also found that Byers relied on this

117

advice and that he would not have made the admission if he had not been so advised.

¶ 10. The circuit court further found that the advice of the trial counsel was erroneous because, at the very least, the law is unclear regarding whether Byers could pursue the issue on appeal. Nevertheless, the circuit court concluded that Byers did not suffer any prejudice by the erroneous advice because it was satisfied that, even if the issue had been preserved, Byers would not have prevailed. The circuit court noted that § 980.02(1) was "poorly worded" but concluded that Byers would not have prevailed because the statute did not limit the authority of the district attorney to cases where the agency with jurisdiction has first made a request of the DOJ. The circuit court therefore denied Byers' post-commitment motion and Byers appealed this decision.

¶ 11. The court of appeals consolidated the appeals and addressed the issue of the Brown County district attorney's authority. It concluded that § 980.02(1) did not prevent the district attorney from filing the Chapter 980 petition against Byers. The court then rejected Byers' claims of ineffectiveness of counsel and the absence of a knowing and voluntary plea. It reasoned that these claims were based on Byers' ability to obtain appellate review of the issue of the district attorney's authority and the court of appeals had now addressed the issue. Accordingly, his ineffectiveness of counsel claim failed because there was no prejudice and his knowing and voluntary plea claim failed because any error was harmless since the court of appeals addressed the issue he sought to preserve. Therefore, the court of appeals affirmed the judgment and orders of the circuit court.

## II

■

¶ 12.   This case provides us with an opportunity to examine the limits of a district attorney's authority to file a petition alleging that a person is subject to involuntary commitment under Chapter 980 as a sexually violent person. Specifically, we must resolve whether, under Wis. Stat. § 980.02(1), a district attorney may file a Chapter 980 petition only if the agency with jurisdiction has first requested the filing of a petition and the DOJ has declined to file.[4] The resolution of this issue is a matter of statutory interpretation which presents a question of law subject to independent appellate review. *State v. Setagord,* 211 Wis. 2d 397, 405–06, 565 N.W.2d 506 (1997).

■

¶ 13.   The goal of statutory interpretation is to discern the intent of the legislature. *Id.* at 406. We first analyze the language of Wis. Stat. § 980.02(1) to determine whether the legislature intended that a district attorney have authority to file only if the DOJ has declined to do so following a request by the agency with jurisdiction. We next examine the statute's legislative history, its purpose, and the policy reasons supporting the conclusion that the legislature intended to create a

_____

[4] The court of appeals determined that the circuit court's post-commitment order concluding that Byers suffered no prejudice because the district attorney had authority to file a Chapter 980 petition preserved the authority issue on appeal. This determination is not contested on review in this court.

Additionally, Byers raised two due process issues in his brief. Because we have reversed the court of appeals decision on the issue of the district attorney's authority, we need not address the due process issues.

significant gatekeeper role for the agency with jurisdiction. Finally, based on our analysis, we determine that the intent of the legislature in enacting § 980.02(1) was to require that there be a request of the agency with jurisdiction followed by a DOJ decision not to file before a district attorney has authority to file a Chapter 980 petition.

### III

¶ 14. Chapter 980 creates an involuntary civil commitment procedure that is intended primarily to provide treatment for sexually violent persons and to protect the public. *State v. Carpenter,* 197 Wis. 2d 252, 258–259, 541 N.W.2d 105 (1995). Under Chapter 980, when a person who may meet the criteria for commitment as a sexually violent person is nearing release from confinement, the agency that will release the person (the "agency with jurisdiction")[5] is required to notify the DOJ and the appropriate district attorneys.[6] The appropriate district attorneys are the district at-

---

[5] Wisconsin Stat. § 980.015(1) states that ". . . 'agency with jurisdiction' means the agency with the authority or duty to release or discharge the person."

[6] Wisconsin Stat. § 980.015(2) provides as follows:

(2) If an agency with jurisdiction has control or custody over a person who may meet the criteria for commitment as a sexually violent person, the agency with jurisdiction shall inform each appropriate district attorney and the department of justice regarding the person as soon as possible beginning 3 months prior to the applicable date of the following:

(a) The anticipated discharge from a sentence, anticipated release on parole or extended supervision or anticipated release from imprisonment of a person who has been convicted of a sexually violent offense.

torney for the county in which the proceeding occurred that resulted in the person's confinement and the district attorney of the county in which the person will reside upon release. *In re Commitment of Goodson,* 199 Wis. 2d 426, 437, 544 N.W.2d 611 (Ct. App. 1996).

¶ 15.   The notice from the agency with jurisdiction must contain specified information including the person's offense history and documentation regarding any treatment.[7] The notice must be sent as soon as possible beginning three months prior to the person's release.

¶ 16.   Under § 980.02(1), the authority to file a Chapter 980 petition is limited to the DOJ and the appropriate district attorneys. The language of § 980.02(1) provides as follows:

980.02 Sexually violent person petition; contents; filing. *(1) A petition alleging that a person is a sexually violent person may be filed by one of the following:*

   *(a) The department of justice at the request of the agency with jurisdiction,* as defined in s. 980.015(1),

(b) The anticipated release from a secured correctional facility, as defined in s. 938.02 (15m), or a secured child caring institution, as defined in s. 938.02 (15g), of a person adjudicated delinquent under s. 938.183 or 938.34 on the basis of a sexually violent offense.

(c) The termination or discharge of a person who has been found not guilty of a sexually violent offense by reason of mental disease or defect under s. 971.17.

[7] Wisconsin Stat. § 980.015(3) provides as follows:

(3) The agency with jurisdiction shall provide the district attorney and department of justice with all of the following:

(a) The person's name, identifying factors, anticipated future residence and offense history.

(b) If applicable, documentation of any treatment and the person's adjustment to any institutional placement.

over the person. If the department of justice decides to file a petition under this paragraph, it shall file the petition before the date of the release or discharge of the person.

*(b) If the department of justice does not file a petition under par. (a), the district attorney* for one of the following:

1. The county in which the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty of or not responsible for a sexuality violent offense by reason of insanity or mental disease, defect or illness.

2. The county in which the person will reside or be placed upon his or her discharge from a sentence, release on parole or extended supervision, or release from imprisonment, from a secured correctional facility, as defined in s. 938.02(15m), or a secured child caring institution, as defined in s. 938.02(15g), or from a commitment order.

(Emphasis added.) The parties agree that the agency with jurisdiction in this case is the DOC.

¶ 17. Byers argues that a request by the agency with jurisdiction and the subsequent declination of the DOJ are prerequisites to the district attorney's authority to file a Chapter 980 petition. This narrow interpretation of the district attorney's authority focuses on the introductory clause in par. (b) that states "If the department of justice does not file a petition under par. (a) . . . ." Byers advances that this clause reflects a statutory framework in which the district attorney's authority to file arises only if the DOJ has had the opportunity to file but has elected not to do so.

¶ 18.  Under this interpretation, if there has been no request by the agency with jurisdiction, the DOJ does not have the opportunity to file a petition. Therefore, in such circumstances, the district attorney's authority is never triggered. Essentially, Byers argues that paragraph (b)'s reference to paragraph (a) incorporates into paragraph (b) the conditions set forth in paragraph (a). Since an agency request is a part of the procedure prescribed in paragraph (a), the request must occur before filing authority can be vested in the district attorney under paragraph (b). Byers maintains that to read the statute otherwise would essentially delete the words "under par. (a)" from the statute.

¶ 19.  The State counters that an agency request is *not* a prerequisite to the district attorney's authority to file a Chapter 980 petition. Its broad interpretation of the district attorney's authority focuses on the prefatory clause to paragraphs (a) and (b) that states that a petition may be filed by "one of the following." Paragraph (a) allows the DOJ to file the petition pursuant to an agency request. Paragraph (b) allows a district attorney to file the petition if the DOJ has not filed a petition. The State advances that the only predicate to the authority of the district attorney to file is that a petition has not already been filed by the DOJ. To interpret the statute otherwise would require that the language "at the request of the agency with jurisdiction" be written into paragraph (b).

¶ 20.  The reference to paragraph (a), according to the State, is simply a direction as to where the authority of the DOJ originates. It was not intended to incorporate the "at the request of the agency with jurisdiction" language as a limit on the district attorney's authority to file. The State argues that to read in such an intention ignores that the agency request language

appears in paragraph (a) but not in paragraph (b) or even in the introductory language to paragraphs (a) and (b).

¶ 21.   The language of § 980.02(1) could have more clearly delineated the limits of the district attorney's authority. We agree with the circuit court that the statute is "poorly worded." If the legislature intended Byers' narrow interpretation, it could have repeated the "at the request of the agency with jurisdiction" language directly within paragraph (b). On the other hand, if the legislature intended the State's broad interpretation, it could have omitted the reference to the DOJ's ability to file "under par. (a)" from paragraph (b). Thus, we look to the legislative history to assist us in discerning the intent of the legislature.

## IV

¶ 22.   Chapter 980 was created by 1993 Wis. Act 479. The bill that eventually became Act 479 was Assembly Bill 3 of the 1994 May Special Legislative Session (A.B. 3). As originally introduced, A.B. 3 contained language that granted filing authority to the district attorney without any requirement that there be a request from the agency with jurisdiction. A.B. 3 also granted filing authority to the DOJ, but the DOJ could file only at the request of the district attorney or the agency with jurisdiction.

¶ 23.   Initially, the district attorney's filing authority was broader than the DOJ's filing authority. The original language of A.B. 3 read as follows:

> 980.02 Sexually violent person petition; contents; filing. (1) A petition alleging that a person is a sexually violent person may be filed by one of the following:
>
> (a) The district attorney for the county in which

124

the person was convicted of a sexually violent offense, adjudicated delinquent for a sexually violent offense or found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect or illness.

(b) The department of justice in any case at the request of a district attorney or the agency with jurisdiction, as defined under s. 980.015(1), over the person. . . .

¶ 24. A.B. 3 was amended by Assembly Amendment 2 (AA-2), which changed the above language to substantially what currently exists in § 980.02(1). Thus, the bill as originally introduced would have allowed the district attorney to file absent a request from the agency with jurisdiction. The State would have us interpret the effect of AA-2 as having very little impact on the district attorney's authority, other than granting the authority to two district attorneys instead of one.

¶ 25. However, the placement of the provisions and the legislative history more strongly support the position that the legislature decided to place the district attorney's authority as secondary to the DOJ's authority and to place the agency with jurisdiction as a "gatekeeper" that limits the authority of both the DOJ and the district attorneys.

¶ 26. A review of the placement of the provisions, together with the legislative history, reflects an intent to create a step-by-step process that must be followed before a district attorney has authority to file a petition. Under this step-by-step process, the initial step is that the agency with jurisdiction evaluates the person to be released to determine whether the person may meet the criteria for commitment as a sexually violent person. If

the agency determines that the person may meet the criteria, the agency requests that the DOJ file a petition. The DOJ can then file a petition or coordinate with one of the appropriate district attorneys regarding filing a petition. Alternatively, the DOJ can determine that a filing is not warranted despite the agency request, in which case one of the appropriate district attorneys can then file the petition on his or her own.

¶ 27. Interpreting AA-2 as changing the district attorney's broad authority to narrow authority is supported by AA-2's change in the placement of the provisions granting authority to the district attorney and the DOJ. As originally drafted, A.B. 3 placed the district attorney's authority first, in paragraph (a). However, AA-2 changed that priority. It instead placed the DOJ in paragraph (a) and the district attorney in paragraph (b), supporting an interpretation that the legislature intended to place the role of the district attorney as secondary to that of the DOJ.

¶ 28. An examination of other legislative history reveals a contemporaneous Legislative Fiscal Bureau memorandum describing the pending bill to members of the legislature. *See* May 19, 1994 Memorandum to Legislators from Robert Lang. The purpose, in part, of the memorandum was to explain the effect of the very amendment which is the focus of our analysis, and which sets forth a step-by-step process: (1) notice is given of impending release or discharge, (2) the DOJ must first make a determination if it is going to file, and (3) if the DOJ determines that it will not prosecute the petition, then (4) the appropriate district attorney can proceed. The memorandum states:

> Amendment 2 ... provide[s] that DOC ... inform (a) the Department of Justice and (b) the District Attorneys of both the county of conviction and the county of

release (if different) of the anticipated discharge or release of the sexual offender. Require DOJ to make a determination of whether it will prosecute the petition for civil commitment and to notify the appropriate DAs of its decision no less than 30 days prior to discharge or release. . . . Provide that, if DOJ determines it will not prosecute the petition, either the DA of the county of convicion or the DA of the county of release may prosecute the petition (at their own cost).

¶ 29. The drafting instructions also support an interpretation that the legislature intended to place the role of the district attorney as secondary to that of the DOJ. Assembly Amendment 2 (AA-2) was identical to Senate Amendment 2 (SA-2), which was drafted using instructions that were identified in the drafting file as being a part of LRBa4722.[8] The instructions provided that "if DOJ refuses, DA can do it . . . (and) DOJ must make decision no later than 30 days b4 release."

¶ 30. Both parties acknowledge that in order for the DOJ to have made a determination of whether it wants to proceed, a referral must be made as a precondition to that determination. Thus, any discussion of a DOJ determination necessarily is premised upon an initial agency referral.

¶ 31. However, the State advances an argument that all that is needed as a precondition for the district attorney to file is that the DOJ has not yet filed. Presumably, under the State's interpretation, even if the DOJ intended to file, but had not yet done so, the district attorney could proceed to file. Under its interpretation, the district attorney need not wait for the DOJ to determine whether it is going to file.

[8] *See* Drafting Record for Senate Amendment 2, May 1994 Spec. Sess. A.B. 3, in drafting record 1993 Wis. Act 479.

¶ 32. AA-2 created Wis. Stat. § 980.02(1)(a) and (b) as they currently exist, along with the requirement that if DOJ decides to file a petition, it must do so no later than 30 days before the date of discharge or release. This 30–day notice requirement, though subsequently vetoed by the governor, illustrates that the State's interpretation is misguided and that the district attorney was to wait for a decision from the DOJ.

¶ 33. The 30–day notice requirement was vetoed by the governor, not because the governor wanted to restore the primary power of the district attorney that AA-2 had taken away, but rather to assist the DOJ. The governor's veto message states that the purpose of the partial veto was to provide the DOJ with more flexibility in filing Chapter 980 petitions. The drafting record for 1993 Wis. Act 479 contains a letter dated May 26, 1994 from the governor to the assembly. The letter states, in part:

> Section 40 contains a requirement that the Department of Justice (DOJ) file a petition against a sexually violent person no later than 30 days before the date of release. This does not provide sufficient flexibility for DOJ to petition for releases. Accordingly, I am partially vetoing the provision requiring the filing of a petition no later than 30 days prior to release or discharge.

¶ 34. The State argues that it is incorrect to interpret the district attorney's authority as secondary to the DOJ's authority because other provisions in Chapter 980 grant the district attorney the same or broader authority than the DOJ. We are not persuaded that the provisions cited by the State support an interpretation that would give a district attorney broader filing authority than the DOJ.

¶ 35. The State cites first several provisions of Chapter 980 that grant equal authority to the district

128

attorney and the DOJ.[9] However, these grants of equal authority simply reflect that, even under the narrow interpretation of the district attorney's authority, there can be circumstances when the district attorney rather than DOJ has properly filed a Chapter 980 petition. In fact, many of these provisions refer to the "district attorney or the department of justice" but then qualify the reference with "whichever is applicable" or "whichever filed the original petition." Therefore, the State's citations regarding the equal authority of the district attorney and the DOJ do not support the conclusion that the district attorney's filing authority must be at least equivalent to the DOJ's authority.

¶ 36. The State also argues that certain provisions of Chapter 980 grant the district attorney broader authority than the DOJ. The State cites two examples. First, the State argues that the listing of two district attorneys (i.e., the county of conviction and the county of intended residence) reflects a broader grant of authority to the district attorneys than to the DOJ. This, however, does not reflect that the authority itself is broad, only that more than one district attorney has the power to exercise the authority that exists.

[9] The State cites the following sections that grant equal authority to the district attorney and the DOJ: § 980.015 (notice from the agency with jurisdiction regarding the release); § 980.05(2) (request for jury trial); § 980.08(2) (right to receive petitions by committed individuals for supervised release); § 980.09(1)(a) (right to receive petition for discharge); § 980.09(1)(b) (representing the state in connection with a petition for discharge with DHFS approval); § 980.09(2)(b) (representing the state in connection with a petition for discharge without DHFS approval); and § 980.11(4) (right to receive notice cards from DHFS without charge).

¶ 37.   As its second example, the State argues that it appears the district attorney can file a Chapter 980 petition at any time up to 90 days *after* a person has been released. This position is untenable in that it is contrary to precedent which interprets § 980.02(2)(ag) as requiring that a Chapter 980 petition be filed on or before the date of a person's release or discharge.[10] *See State v. Thiel,* 2000 WI 67, , ¶¶ 30–32, 235 Wis. 2d 823, 612 N.W.2d 94; *State v. Thomas,* 2000 WI App 162, ¶ 17, 238 Wis. 2d 216, 225, 617 N.W.2d 230; *State v. Pharm,* 2000 WI App 167, ¶ 15, 238 Wis. 2d 97, 111, 617 N.W.2d 163.

¶ 38.   We recognize that the step-by-step process elevates the role of the agency with jurisdiction in determining when a Chapter 980 petition can be filed. There are several policy reasons that support having the agency with jurisdiction serve as such a gatekeeper.

¶ 39.   First, the agency with jurisdiction has the person under its supervision, care, and custody. Accordingly, it has the most comprehensive information regarding the person's status under Chapter 980. Second, not only does the agency with jurisdiction have a significant amount of information regarding the person, but it also has a significant amount of knowledge and expertise with supervising and dealing with the type of offenders that are potentially subject to Chapter 980 petitions.

¶ 40.   Third, the agency with jurisdiction has the most recent contact with the person, whereas the district attorney of the county of conviction will likely have lost personal contact during the years of confine-

---

[10] Wisconsin Stat. § 980.02(2)(ag) requires that a Chapter 980 petition allege that the "person is within 90 days of discharge or release, on parole, extended supervision or otherwise, from a sentence . . . . "

ment. The district attorney of the county of intended residence may have had no prior contact with the person. Fourth, a gatekeeper role for the agency with jurisdiction facilitates creating a consistent and coordinated process for filing Chapter 980 petitions.

¶ 41.   Fifth, there is a benefit to having a central screening process to conserve scarce resources because Chapter 980 cases can be complex and can result in significant treatment costs. Sixth, the use of the independent expertise of the agency with jurisdiction can be a tool for ensuring that the decision to file a Chapter 980 petition is insulated from local pressures.

¶ 42.   Granted, there is nothing in the legislative history that directly articulates reasons for or against placing the agency with jurisdiction in a gatekeeper role that limits the district attorney's authority. However, the existence of these policy reasons supports the conclusion that such a broad gatekeeper role would be consistent with a legislative intent to create a step-by-step process that enhances the coordinated and efficient operation of Chapter 980.

## V

██

¶ 43.   In sum, we conclude that, under § 980.02(1), a request from the agency with jurisdiction and a subsequent decision by the DOJ not to file are prerequisites to a district attorney's authority to file a Chapter 980 petition. Because those prerequisites were not met in this case, we determine that the petition was not properly filed. Accordingly, we reverse the court of appeals and remand the matter to the circuit court for dismissal of the petition.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded.

¶ 44.   JON P. WILCOX, J., did not participate.

¶ 45.   SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I write separately to respond to Justice Crooks's conclusion, in dissent, that the rules of statutory interpretation, specifically the plain meaning rule, "prohibit" a court from looking to legislative history, context, purpose, and subject matter when construing a statute in the absence of an express finding that the statute is ambiguous.[1]

¶ 46.   An examination of our cases involving statutory interpretation demonstrates that this court often mechanically repeats the plain meaning rule that it will not resort to extrinsic sources when the meaning of the text is unambiguous. Yet in a large number of these cases the court has examined sources beyond the specific text of the statute at issue to determine the meaning of the language, regardless of any finding that the text is ambiguous.[2] Even a casual observer of the

---

[1] Dissent, ¶ 65.

[2] For an example of a recent Wisconsin case discerning legislative intent by looking to the language of a statute as well as its scope, history, context, subject matter, and purpose, see *Fox v. Catholic Knights Insurance Co.,* 2003 WI 87, 263 Wis. 2d 208, 665 N.W.2d 181 (examining legislative history to support interpretation of unambiguous language).

The dissent cites to *VanCleve v. City of Marinette,* 2003 WI 2, ¶ 17, 258 Wis. 2d 80, 655 N.W.2d 113, and *State v. Delaney,* 2003 WI 9, ¶¶ 13–14, 259 Wis. 2d 77, 658 N.W.2d 416, for the proposition that the court must not look beyond the statutory language to ascertain a statute's meaning if the language of a statute is clear and unambiguous. Yet neither of these cases adopts such a simplistic method of statutory interpretation. In *VanCleve,* for example, this court looked to case law and legislative history to properly construe Wis. Stat. § 81.17. *See VanCleve,* 258 Wis. 2d 80, ¶ 23 ("In addition to the plain

Wisconsin cases would, without fear of being contradicted, summarize the case law as adopting inconsistent approaches to statutory interpretation.[3]

¶ 47.  We should, I believe, stop paying lip service to the supremacy of the plain meaning rule[4] and clearly

---

language of the statute, Wisconsin case law interpreting the statutory language provides guidance on this issue."), ¶¶ 28–29 (setting forth the historical construction and development of Wis. Stat. § 81.17). Similarly, in *Delaney,* this court admitted that even a clear and unambiguous statute could be construed contrary to its plain meaning "if a literal application would lead to an absurd or unreasonable result." *Delaney,* 259 Wis. 2d 77, ¶ 15 (citing *Coca-Cola Bottling Co. v. LaFollette,* 106 Wis. 2d 162, 170, 316 N.W.2d 129 (Ct. App. 1982)).

[3] *See, e.g.,* Kenneth R. Dortzbach, *Legislative History: The Philosophies of Justices Scalia and Breyer and the Use of Legislative History by the Wisconsin State Courts,* 80 Marq. L. Rev. 161, 201–19 (1996); Brad A. Liddle, *Statutory Construction —Legislative Intent—Use of Extrinsic Aids in Wisconsin,* 1964 Wis. L. Rev. 660.

[4] Rules of interpretation cannot by themselves be dispositive in interpreting a statute because almost every rule can be countered by an opposing rule. Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed,* 3 Vand. L. Rev. 395 (1950).

Moreover, the dissent's insinuation that employing the full array of rules of statutory construction should be equated with a "results-oriented" analysis is simplistic. Dissent, ¶ 63. The plain meaning rule can be manipulated as well as any other rule of statutory construction to reach a particular result. *See* Richard A. Posner, *Statutory Interpretation—In the Classroom and in the Courtroom,* 50 U. Chi. L. Rev. 800, 816–17 (1983) ("By making statutory interpretation seem mechanical rather than creative, the canons conceal, often from the reader of the judicial opinion and sometimes from the writer, the extent to which the judge is making new law in the guise of interpreting a statute or a constitutional provision.").

adopt a more encompassing analytic model for statutory interpretation.[5]

Although courts may be influenced by rules of interpretation, the legislature apparently is not. Former Chief Judge of the District of Columbia Court of Appeals and former Congressman Abner Mikva writes of "canons of interpretation" as follows: "When I was in Congress, the only 'canons' we talked about were the ones the Pentagon bought that could not shoot straight." Abner Mikva, *Reading and Writing Statutes,* 48 U. Pitt. L. Rev. 627, 629 (1987).

[5] I have used this approach in majority and minority opinions. *See, e.g., Fox v. Catholic Knights Ins. Co.,* 2003 Wis. 2d 87, ¶ 44, 665 N.W.2d 181 (Abrahamson, C.J., concurring); *State v. Peters,* 2003 WI 88, ¶ 34, 263 Wis. 2d 475, 665 N.W.2d 171 (Abrahamson, C.J., concurring); *State v. Davison,* 2003 WI 89, 263 Wis. 2d 146, 666 N.W.2d 1 (Abrahamson, C.J., dissenting); *State v. Cole,* 2003 WI 59, 262 Wis. 2d 167, 663 N.W.2d 700; *Juneau County v. Courthouse Employees,* 221 Wis. 2d 630, 641–51, 585 N.W.2d 587 (1998); *State v. Sample,* 215 Wis. 2d 487, 510, 573 N.W.2d 187 (1998) (Abrahamson, C.J., concurring); *State v. Stoehr,* 134 Wis. 2d 66, 75–82, 396 N.W.2d 177 (1986); *City of Madison v. Town of Fitchburg,* 112 Wis. 2d 224, 244, 332 N.W.2d 782 (1983) (Abrahamson, J., dissenting); *Milwaukee County v. DILHR,* 80 Wis. 2d 445, 451, 456, 259 N.W.2d 118 (1977).

I have tried to use this approach consistently, though I, like all judges, probably have not been consistent. Justice Scalia explains his inconsistency in using legislative history in interpreting statutes contrary to his textualist approach as follows: "I play the game like everybody else . . . I'm in a system which has accepted rules and legislative history is used . . . You read my opinions, I sin with the rest of them." *Judges and Legislators: Toward Institutional Comity,* 175–75 (R. Katzmann ed. 1988) (Justice Scalia's comments during a panel discussion) (*quoted in* Frank H. Easterbrook, *What Does Legislative History Tell Us?,* 66 Chi.-Kent L. Rev. 441, 442 n.4 (1991)).

¶ 48. This court has consistently and resolutely held that the purpose of statutory interpretation is to determine and give effect to the intent of the legislature in enacting a particular statute. It is, of course, a legal fiction to assert that there is an actual legislative "intent."[6] "It is impossible to argue that a legislative body actually has a collective, corporate intent that is somehow the sum of the individual, and often conflicting, intents of its members."[7]

¶ 49. Rather, discerning and giving effect to the "intent" of the legislature is an exercise in logic in which a court determines what a reasonable person in the position of a legislator enacting the statute would have said about the legal issue presented in a given case.[8] As Judge Richard Posner has written, "The judge should try to think his way as best he can into the minds of the enacting legislators and imagine how they would have wanted the statute applied to the case at bar."[9] Rules of statutory interpretation are merely codified expressions of legal reasoning that assist courts in this task.

¶ 50. To insist dogmatically on the primacy and supremacy of the plain meaning rule, to the exclusion of

---

[6] *See, e.g.,* Daniel A. Farber & Philip P. Frickey, *Legislative Intent and Public Choice,* 74 Va. L. Rev. 423, 423 (1988).

[7] Burt Neuborne, *Background Norms for Federal Statutory Interpretation,* 22 Conn. L. Rev. 721, 724 (1990).

[8] Cass R. Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv. L. Rev. 405, 429 (1989) (arguing that searching for legislative intent does not involve looking for "a general legislative aim or purpose, but instead to see more particularly how the enacting legislature would have resolved the question, or how it intended that question to be resolved, if it had been presented.").

[9] Richard A. Posner, *Statutory Interpretation—In the Classroom and in the Courtroom,* 50 U. Chi. L. Rev. 800, 817 (1983).

all other rules of statutory interpretation, is neither helpful to this endeavor[10] nor supported in law.[11] Proper statutory interpretation requires that a court take a comprehensive view toward determining legislative intent. A court begins with the language of the statute and then considers all relevant evidence of legislative intent including its "scope, history, context, subject matter and purpose."[12] All of these factors bear on the interpretation of the language, and no single one is exclusive or controlling.[13]

¶ 51. The language of a given statute is without a doubt the most important indication of legislative "intent." After all, the words are the objective manifestation of the legislative intent we seek to discern. More

---

[10] *See State v. Courchesne,* 816 A.2d 562, 581–83 (Conn. 2003) (concluding that the plain meaning rule is not a "useful rubric for the process of statutory interpretation" because it is inconsistent with the purposive and contextual nature of the legislative language, it is inherently self-contradictory, and it requires the court to engage in a threshold determination of whether language is ambiguous, which tends to lead to "intellectually and linguistically dubious" declarations that leave a court open to criticisms that it is results-oriented).

[11] *See Train v. Colo. Pub. Interest Research Group, Inc.,* 426 U.S. 1, 10 (1976) ("[W]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'") (quoting *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 543–44 (1940)).

[12] *Scott by Ricciardi v. First State Ins. Co.,* 155 Wis. 2d 608, 612, 456 N.W.2d 152 (1990) ("The cardinal rule in all statutory interpretation, as this court has often said, is to discern the intent of the legislature. The court will ascertain that intent by examining the language of the statute as well as its scope, history, context, subject matter and purpose.").

[13] *State v. Stoehr,* 134 Wis. 2d 66, 82, 396 N.W.2d 177 (1986).

importantly, citizens obligated to follow the law, public officials elected to carry out the law, and attorneys employed to advise clients on the meaning of the law should be able to rely upon the words written in the Wisconsin Statutes when fulfilling these duties.

¶ 52. Nevertheless, language, especially statutory language, is often ambiguous. "Anything that is written may present a problem of meaning . . . . The problem derives from the very nature of words. They are symbols of meaning. But unlike mathematical symbols, the phrasing of a document, especially a complicated enactment, seldom attains more than approximate precision."[14] Language is further a product of its time and context. "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used."[15]

¶ 53. Moreover, statutory language is also specifically adopted with a purpose beyond the mere conveyance of words as symbols of meaning. The legislature enacts statutes in order to address social problems. As Karl Llewellyn has remarked, "If a statute is to make sense it must be read in the light of some assumed purpose. A statute merely declaring a rule, with no purpose or objective, is nonsense."[16]

---

[14] Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527, 528 (1947).

[15] *Towne v. Eisner,* 245 U.S. 418, 425 (1918); *see also* William N. Eskridge, *Textualism, the Unknown Ideal?,* 96 Mich. L. Rev. 1509, 1559 (1998) (reviewing Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997)) ("Reading the legislative history puts the judge better in touch with the values, vocabulary, and policy choices of the authors of the statute . . . .").

[16] Llewellyn, *supra* note 4, at 400 (1950).

¶ 54. Proper statutory interpretation therefore requires that a court begin—but not necessarily end—with the language of the statute. A court must also consider all other relevant and available evidence concerning the history of the statute's enactment, the purpose of the statute, the statute's context, and the subject matter of the statute to ensure that it adopts the construction most consistent with the "intent" of the legislature. A judge must consider "the usual things that the intelligent literature on statutory construction tells him to look at—such as the language and apparent purpose of the statute, its background and structure, its legislative history . . . and the bearing of related statutes."[17]

¶ 55. Scholars have long understood that statutory interpretation is a process involving the consideration of all evidence bearing on the meaning of a statute.[18] State courts are following suit. The Alaska

[17] Posner, *supra* note 9, at 818; *see also* William N. Eskridge, Jr. & Philip P. Frickey, *Statutory Interpretation as Practical Reasoning,* 42 Stan. L. Rev. 321, 352 (1990):

> [A]n interpreter will look at a broad range of evidence—text, historical evidence, and the text's evolution—and thus form a preliminary view of the statute. The interpreter then develops that preliminary view by testing various possible interpretations against the multiple criteria of fidelity to the text, historical accuracy, and conformity to contemporary circumstances and values. Each criterion is relevant, yet none necessarily trumps the others.

[18] *See, e.g.,* T. Alexander Aleinikoff, *Updating Statutory Interpretation,* 87 Mich. L. Rev. 20 (1988); Stephen Breyer, *On the Uses of Legislative History,* 65 S. Cal. L. Rev. 845 (1992); Ronald Dworkin, *Law as Interpretation,* 60 Tex. L. Rev. 527 (1982); William N. Eskridge, Jr. & Philip P. Frickey, *Statutory Interpretation as Practical Reasoning ,* 42 Stan. L. Rev. 321 (1990); Daniel A. Farber & Philip P. Frickey, *Legislative Intent*

Supreme Court, for example, has adopted a sliding-scale approach to statutory interpretation in which a court looks to the statutory language as well as all other extrinsic sources of information bearing on legislative intent, recognizing that the clearer the language is in a given statute, the more convincing other sources must be to prove a contrary legislative intent.[19] Similarly, the Connecticut Supreme Court has rejected its on-again-off-again adherence to the plain meaning rule and made explicit that it will consider "all of those sources beyond

*and Public Choice*, 74 Va. L. Rev. 423 (1988); Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum. L. Rev. 527 (1947); L. Fuller, *Positivism and Fidelity to Law—A Reply to Professor Hart,* 71 Harv. L. Rev. 630 (1958); J. Willard Hurst, *Dealing with Statutes* (1982); Llewellyn, *supra* note 4; William D. Popkin, *Statutes in Court: The History and Theory of Statutory Interpretation* (1999); Richard A. Posner, *The Problems of Jurisprudence* (1990); Max Radin, *A Short Way with Statutes,* 56 Harv. L. Rev. 388 (1942); Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997); Jane S. Schacter, *The Confounding Common Law Originalism in Recent Supreme Court Statutory Interpretation: Implications for the Legislative History Debate and Beyond,* 51 Stan. L. Rev. 1 (1998); Norman J. Singer, *Statutes and Statutory Construction* § 45.02 (6th ed. 2000); Adrian Vermeule, *The Cycles of Statutory Interpretation,* 68 U. Chi. L. Rev. 149 (2001).

The literature on statutory interpretation is voluminous.

[19] *Homer Elec. Ass'n v. Towsley,* 841 P.2d 1042, 1043–44 (Alaska 1992); *State v. Alex,* 646 P.2d 203, 208 n.4 (Alaska 1982) (under Alaska's sliding-scale approach to statutory interpretation, the more plain the language of the statute, the more convincing the evidence of contrary legislative intent must be).

*See* J. Willard Hurst, *The Legislative Branch and the Supreme Court,* 5 U. Ark. J. L. 487, 499 (1985) (suggesting this kind of sliding scale).

the language itself without first having to cross any threshold of ambiguity of the language."[20]

¶ 56.   Wisconsin should be no different. As early as 1871, our court recognized that the plain meaning rule was merely part of a broader, more comprehensive view toward statutory interpretation. We explained:

> [T]he true rule for the construction of statutes is, to look at the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law, and thus, to ascertain the *true* meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words.[21]

This comprehensive analytical framework reflects a more pragmatic view of the legislative and judicial processes, promotes greater judicial candor, and maintains the supremacy of the legislature as the policy and rule making governmental institution. By using this comprehensive approach to statutory interpretation we acknowledge and deal with "interpretive problems that arise from the inherent ambiguity of language as well as the limits of our linguistic capabilities"[22] and sufficiently uphold our duty to interpret and apply the statutory law of the state of Wisconsin.

¶ 57.   For the reasons set forth, I write separately.

¶ 58.   I am authorized to state that Justice WILLIAM A. BABLITCH joins this concurrence.

---

[20] *Courchesne,* 816 A.2d at 578.

[21] *Harrington v. Smith,* 28 Wis. 43, 59 (1871) (emphasis in original).

[22] *Sample,* 215 Wis. 2d at 510 (Abrahamson, C.J., concurring) (citing Lawrence M. Solan, *The Language of Judges* 38, 117 (1993)).

¶ 59. WILLIAM A. BABLITCH, J. *(concurring).* *"That depends on what the meaning of the word 'is' is."* William Jefferson Clinton.

¶ 60. I write only to emphasize that canons of statutory construction, such as the "plain meaning" rule, are tools, not rules. They are all designed to reach one fundamental goal: discerning legislative intent. Ignoring relevant evidence on legislative intent in the name of "plain meaning" will necessarily at times lead to an interpretation that is completely contrary to what the legislature intended.

¶ 61. Language is inherently ambiguous— perhaps not as ambiguous as the quotation above would have us believe, but the quote makes a point: plain meaning is frequently in the eye of the beholder. What is plain to one may be ambiguous to another. If good evidence as to legislative intent is present, why not use it? Accordingly, I join Chief Justice Abrahamson's concurrence.

¶ 62. N. PATRICK CROOKS, J. *(dissenting).* For the reasons set forth below, I respectfully dissent.

¶ 63. The majority opinion fails to follow well-established rules of statutory interpretation. As we have consistently noted, the purpose of statutory interpretation is to ascertain and give effect to the legislature's intent. *State v. Delaney,* 2003 WI 9, ¶ 13–14, 259 Wis.2d 77, 658 N.W.2d 416. In a results-oriented analysis, the majority fails to cite several well-established statutory interpretation rules. *See* majority op., ¶ 13. Specifically, the majority ignores the rule, which we have reiterated on several occasions this term, that when determining legislative intent, we first look to the language of the statute itself. *State v. Delaney,* 2003 WI 9, ¶ 13–14; *VanCleve v. City of*

141

*Marinette,* 2003 WI 2, ¶ 17, 258 Wis.2d 80, 655 N.W.2d 113. As we clearly noted in *VanCleve:*

> . . . [I]t is a well established rule that if the language of a statute is clear and unambiguous, the court must not look beyond the statutory language to ascertain the statute's meaning. Only when statutory language is ambiguous may we examine other construction aids such as legislative history, context, and subject matter.

*VanCleve,* ¶ 17 (citing *State v. Waalen,* 130 Wis.2d 18, 24, 386 N.W.2d 47 (1986). Accordingly, if the meaning of the statute is clear on its face, this court will not look outside the statute in applying it.

¶ 64.   The majority disregards this first step. Indeed, the majority never explicitly finds the language of Wis. Stat. § 980.02(1) ambiguous. Instead, the majority uses phrases such as: "[t]he language of § 980.02(1) *could have more clearly delineated* the limits of the district attorney's authority," and "if the legislature intended the State's broad interpretation, it *could have omitted* the reference to the DOJ's ability to file. . . . " See majority op. at ¶ 21 (emphasis added). The majority does not state that the statutory language is ambiguous. Instead, without doing so, the majority engages in an analysis of the legislative history.

¶ 65.   As noted above, the rules of statutory interpretation are clear. Unless the language is ambiguous, we are to apply the clear language of the statute. Moreover, if the language is clear, the rules of statutory interpretation prohibit us from doing exactly what the majority does. Unless the statutory language is established as ambiguous,[1] we are prohibited from engaging

---

[1] The Chief Justice Abrahamson's concurrence claims that language is often ambiguous. See Chief Justice Abrahamson's

in an analysis of whether the legislature *could have* worded the statute differently, or whether it *could have omitted* certain references.

concurrence at ¶ 52: "language, especially statutory language, is often ambiguous." If this was correct, we could never simply "appl[y] the law as written," as we have previously done. *See State ex rel. Brookside Poultry Farms v. Jefferson County Bd. of Adjustment,* 131 Wis. 2d 101, 113, 388 N.W.2d 593 (1986) ("The statute and ordinance clearly state that persons aggrieved, not parties aggrieved, have a right to appeal. This court applies the law as written.") (emphasis in original). Instead, we would as a rule in every case, start with the assumption of ambiguity, and then begin a search for extrinsic sources of meaning. To the contrary, we have repeatedly held that the statutory language at issue was quite clear (and therefore not "often ambiguous"). *See, e.g., State v. Wideman,* 206 Wis. 2d 91, 102, 556 N.W.2d 737 (1996) (Wis. Stat. § 346.65(2)(c) is "clear and unambiguous"); *Nicholson v. Home Ins. Cos.,* 137 Wis. 2d 581, 593, 405 N.W.2d 327 (1987) ("The operative language of sec. 807.01(4) clearly indicates that an offer of settlement under sec. 807.01(4) must be made under sec. 807.01 . . . . Sec. 807.01(3) makes it clear . . . " The statute also makes clear that . . . ").

    *See also Stephenson v. Universal Metrics, Inc.,* 2002 WI 30, 251 Wis. 2d 171; 641 N.W.2d 158 ("The immunity statute does not apply in the present case because imposing liability on Kreuser for breaking his promise is unrelated to and outside of the clear and unambiguous scope of this immunization statute.") (Abrahamson, C.J., dissenting).

    If language were "often ambiguous," it is not at all clear how the language a court might examine regarding the scope, history, context, and purpose of a statute would be at all helpful. In fact, "one Supreme Court Justice [has] remarked that because the legislative history is often ambiguous, 'it is clear that we must look primarily to the statutes themselves to find the legislative intent,' rather than the other way around." *See* Kenneth R. Dortzbach, *Legislative History: The Philosophies of Justices Scalia and Breyer and the Use of Legislative History by the Wisconsin State Courts,* 80 Marq. L. Rev. 161, 162 (1996); Chief Justice Abrahamson's concurrence, ¶ 46 n.3.

worded the statute differently, or whether it *could have omitted* certain references.

¶ 66. Following these well-established rules of statutory interpretation, I agree with the court of appeals that Wis. Stat. § 980.02(1) is clear on its face. As the court of appeals noted:

> If the DOJ does not file a petition, subsec. (b) allows the district attorney for the county where the person was convicted of the sexually violent offense or where that person will reside or be placed upon release from imprisonment to file a petition for commitment. Wis. Stat. § 980.02(1)(b). We note that § 980.02(1) neither requires the DOC to make a referral to the DOJ nor the latter to expressly decline filing as a condition precedent to the district attorney instituting proceedings. The sole requirement is that the DOJ, under whatever circumstances, did not file a petition.
>
> We conclude that Wis. Stat. § 980.02(1)(b) unambiguously permits the district attorney in either the county of conviction or of anticipated residence or placement upon discharge to file a Wis. Stat. ch. 980 petition in the event the DOJ does not. Here it is undisputed that the department did not file a petition, but the district attorney for the county in which Byers would have resided upon discharge did.

*State v. Byers,* Nos. 99–2441 & 00–0454, unpublished slip op. at ¶ 18–19 (Wis. Ct. App. Jan. 23, 2001).

¶ 67. For the reasons discussed, I respectfully dissent.

¶ 68. I am authorized to state that Justice DIANE S. SYKES joins this dissent.